UNITED STATES of America, Plaintiff-Appellant,

v.

John TORKINGTON, Defendant-Appellee.

No. 86–5155.

United States Court of Appeals, Eleventh Circuit.

March 20, 1987.

---

Nancy L. Worthington, Linda Collins Hertz, Asst. U.S. Atty., Miami, Fla., for plaintiff-appellant.

James J. Kenny, Kenny, Nachwalter & Seymour, P.A., Brian F. Spector, William J. Blechman, Miami, Fla., John F. Flaherty, Gibney, Anthony & Flaherty, Brian W. Brokate, New York City, for amicus curiae, Rolex Watches.

Timothy W. Harrington, Fort Lauderdale, Fla., for defendant-appellee.

Before KRAVITCH and HATCHETT, Circuit Judges, and MORGAN, Senior Circuit Judge.

Corrected March 25, 1987.

KRAVITCH, Circuit Judge:

The definition of the term "counterfeit mark" under section 2320(d)(1)(A) of the

Trademark Counterfeiting Act of 1984 (the Act), 15 U.S.C. §§ 1116–1118, 18 U.S.C. § 2320, is at issue in this case of first impression. The district court held that a mark is not "counterfeit" under section 2320(d)(1)(A) unless the use of the mark in connection with the goods in question would be likely to cause direct purchasers to be confused, mistaken or deceived. The court found that, given the enormous price differential between the allegedly counterfeit goods and the authentic goods, it was unlikely, as a matter of law, that direct purchasers would be confused, mistaken or deceived. The court therefore dismissed the indictment.

We find that the district court's ruling that section 2320(d)(1)(A) requires a showing that direct purchasers would be likely to be confused, mistaken or deceived is not supported by either the language or the legislative history of the section. Accordingly, we hold that section 2320(d)(1)(A) does not require a showing that direct purchasers would be confused, mistaken or deceived; rather, the section is satisfied where it is shown that members of the purchasing public would be likely to be confused, mistaken or deceived. Moreover, we find that this likely confusion test includes the likelihood of confusion in a post-sale context.

## I. BACKGROUND

On June 2, 1985, Edward Little, a private investigator with Rolex Watch U.S.A., Inc., visited a booth operated by appellee John Torkington at the Thunderbird Swap Shop Indoor Flea Market in Fort Lauderdale, Florida. Little noticed a salesman at the booth showing customers two watches bearing both the name "Rolex" and the Rolex crown trademark emblem. The watches were virtually indistinguishable from authentic Rolex watches. These allegedly counterfeit Rolex watches had been kept under the counter; there were no such watches on display.

Little asked to see those watches as well as other models of replica Rolex watches. The salesman showed him several. The salesman said that the watches were $27 each. Little asked the salesman whether the watches were guaranteed. The salesman responded that they were not guaranteed but said that Little could return any watch that broke to the booth and the salesman would fix it. Little purchased a watch. The salesman handed it to him in a pouch bearing the Rolex crown mark. It is undisputed that Little knew that he had purchased a replica Rolex watch and not an authentic one.

On June 23, 1985, a deputy marshal executed a search and seizure order on Torkington's booth at the Thunderbird Flea Market. He seized 742 replica Rolex watches bearing both the Rolex name and crown trademarks.

On October 3, 1985, a federal grand jury in the Southern District of Florida charged Torkington with two counts of trafficking and attempting to traffic in counterfeit Rolex watches, in violation of 18 U.S.C. § 2320(a). Count I of the indictment is based on the June 2, 1985 sale of the watch to Little. Count II is based on the 742 replica Rolex watches that were seized from Torkington's booth on June 23, 1985.[1]

---

1. The indictment at issue in this case reads as follows:

COUNT I

On or about June 2, 1985, at Fort Lauderdale, Broward County, in the Southern District of Florida, the defendant,

JOHN TORKINGTON,

knowingly used counterfeit marks on or in connection with goods, in that the defendant did intentionally traffic, and attempt to traffic in watches bearing what he knew to be counterfeit marks that were identical with, and substantially indistinguishable from, marks registered for Rolex Watch U.S.A., Inc., and Montres Rolex S.A., on the principal register in the United States Patent and Trademark Office, which marks were then in use by Rolex Watch U.S.A., Inc., and Montres Rolex S.A., and the use of which are likely to cause confusion, cause mistakes and deceive; all in violation of Title 18, United States Code, Section 2320(a) (Pub.L. 98–473, Title II, § 1502(a), Oct. 12, 1984, 98 Stat. 2178).

COUNT II

On or about June 23, 1985, at Fort Lauderdale, Broward County, in the Southern District of Florida, the defendant,

JOHN TORKINGTON,

knowingly used counterfeit marks on or in connection with goods, in that the defendant

Torkington filed two motions to dismiss the indictment pursuant to Fed.R.Crim.P. 12(b). Following hearings on the matter, the court issued an order on February 10, 1986 dismissing both counts of the indictment on the ground that the replica Rolex watches were not "counterfeit" under section 2320(d)(1)(A). The United States appealed.

## II. DEFINITION OF "COUNTERFEIT MARK"

■ The district court concluded that the replica Rolex watches in question were not "counterfeit" under section 2320(d)(1)(A)(iii) because it determined that the section is not satisfied unless the use of the mark would be likely to cause direct purchasers of the allegedly counterfeit goods to be confused, mistaken or deceived. The court concluded that the government could not prove a section 2320 violation in the instant case because "it [is] unlikely ... that the purchaser of a replica or fake Rolex watch that sold for $27.00 would be confused, mistaken or deceived into thinking that he was purchasing a genuine Rolex watch, which may sell for approximately $1,000 to $8,000." The court also ruled that the likely confusion of members of the public who encounter the allegedly counterfeit watches in a post-sale context is irrelevant

to the section 2320(d)(1)(A)(iii) inquiry.[2] We disagree with both of these conclusions.[3]

Section 2320 of the Trademark Counterfeiting Act was enacted in order to increase the sanctions for the counterfeiting of certain registered trademarks above the purely civil remedies available under the Trademark Act of 1946, 15 U.S.C. § 1051 *et seq.* [hereinafter the Lanham Act]. *Report of the Committee on the Judiciary,* H.R.Rep. No. 997, 98th Cong., 2d Sess. 1, 4 (1984) [hereinafter H.R.Rep. No. 997]; *Report of the Senate Committee on the Judiciary,* S.Rep. No. 526, 98th Cong., 2d Sess. 1, *reprinted in,* 1984 U.S.Code Cong. & Admin.News 3182, 3627 [hereinafter S.Rep. No. 526].

Section 2320 is narrower in scope than is the Lanham Act, however. In particular, its sanctions are available only where the defendant "knowingly uses a counterfeit mark on or in connection with" the goods or services in question. 18 U.S.C. § 2320(a).

The section defines "counterfeit mark" as:

(A) a spurious mark—

(i) that is used in connection with trafficking in goods or services;

(ii) that is identical with, or substantially indistinguishable from, a mark reg-

---

did intentionally traffic, and attempt to traffic in watches bearing what he knew to be counterfeit marks that were identical with, and substantially indistinguishable from, marks registered for Rolex Watch U.S.A., Inc., and Montres Rolex S.A., on the principal register in the United States Patent and Trademark Office, which marks were then in use by Rolex Watch U.S.A., Inc., and Montres Rolex S.A., and the use of which are likely to cause confusion, cause mistakes and deceive; all in violation of Title 18, United States Code, Section 2320(a) (Pub.L. 98–473, Title II, § 1502(a), Oct. 12, 1984, 98 Stat. 2178).

**2.** The government claims that the district court's holding dismissing the indictment also is based on the court's conclusion that § 2320(d)(1)(A)(iii) requires a showing of actual confusion. The government contends that showing of actual confusion is not necessary and that the proper standard is likelihood of confusion. *See, e.g., E. Remy Martin and Co. v. Shaw-Ross Int'l Imports,* 756 F.2d 1525, 1529 (11th Cir.1985) (the law under the civil trade-

mark statute "is well settled in this circuit that evidence of *actual* confusion between trademarks is not necessary to a finding of *likelihood* of confusion, although it is the best such evidence.") (emphasis in original); *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 978 (11th Cir.1983); *Rolls-Royce Motors Ltd. v. A & A Fiberglass, Inc.,* 428 F.Supp. 689, 695 (N.D.Ga. 1985) (proof of actual confusion not necessary where likely confusion exists). We do not address this claim because we conclude that the district court, albeit improperly, applied a likelihood of confusion standard, not an actual confusion standard.

**3.** We are the first circuit court to consider the issue of the proper definition of the term "counterfeit mark" under § 2320(d)(1)(A). Moreover, to our knowledge only two lower courts have considered the proper interpretation of the term counterfeit mark, *United States v. Infurnari,* 647 F.Supp. 57 (W.D.N.Y. 1986); *United States v. Gonzalez,* 630 F.Supp. 894 (S.D.Fla.1986). Both courts adopted essentially the same interpretation that we do here.

istered for those goods or services on the principal register in the United States Patent and Trademark Office and in use, whether or not the defendant knew such mark was so registered; and

*(iii) the use of which is likely to cause confusion, to cause mistake, or to deceive;*

18 U.S.C. § 2320(d)(1)(A) (emphasis added).

A. *Confusion of the Purchasing Public*

The "likely to cause confusion, to cause mistake, or to deceive" test of section 2320(d)(1)(A)(iii) is broadly worded. Nothing in the plain meaning of the section restricts its scope to the use of marks that would be likely to cause direct purchasers of the goods to be confused, mistaken or deceived.

The legislative history indicates that Congress intentionally omitted such limiting language. Congress easily could have inserted language restricting the scope of section 2320(d)(1)(A)(iii) to cases where it is

likely that direct purchasers would be confused, mistaken or deceived. Congress in fact had used such limiting language in a similar context in the original version of section 1114(1) of the Lanham Act. *Syntex Laboratories Inc. v. Norwich Pharmacal Co.*, 437 F.2d 566, 568 (2d Cir.1971); *Rolls-Royce Motors Ltd. v. A & A Fiberglass, Inc.*, 428 F.Supp. 689, 694 n. 10 (N.D.Ga. 1977). Congress therefore had before it language it could have used to restrict section 2320(d)(1)(A)(iii) to situations where direct purchasers would be likely to be confused, mistaken, or deceived. Congress chose not to use either this or similar limiting language and we will not construe section 2320(d)(1)(A)(iii) in a way that adds a restriction that Congress chose not to include.

Moreover, not only did Congress omit the limiting language of the original version of section 1114(1) from section 2320(d)(1)(A)(iii), but it explicitly employed the language of the current version of section 1114(1) of the Lanham Act.[4] H.R.Rep.

**4.** 15 U.S.C. § 1114(1) provides in pertinent part:
(1) Any person who shall, without the consent of the registrant—
    (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use *is likely to cause confusion, or to cause mistake, or to deceive;* or
    (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use *is likely to cause confusion, or to cause mistake, or to deceive.*
shall be liable in a civil action by the registrant for the remedies hereinafter provided....
(emphasis added).
    It is clear from the legislative history that Congress intentionally employed the language of § 1114(1) when it drafted § 2320(d)(1)(A)(iii). *Report of the Committee on the Judiciary,* H.R.Rep. No. 997, 98th Cong., 2d Sess. 12 (1984) [hereinafter H.R.Rep. No. 997]; *Joint Statement on Trademark Counterfeiting Legislation,* Cong.Rec. at H12,078 (daily ed. Oct. 10, 1984) [hereinafter *Joint Statement* ]. Congress employed the identical language in

order "to ensure that no conduct will be criminalized by this act that does not constitute trademark infringement under the Lanham Act." *Joint Statement,* Cong.Rec. at H12,078. In particular, Congress used this language to limit the scope of the criminal act to marks in commercial use, H.R.Rep. No. 997, at 12, a limitation that is explicit in the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a), but is not explicit in § 2320(d)(1)(A).
    The legislative history does not suggest that Congress intended for § 2320(d)(1)(A)(iii) to serve a purpose other than that of linking the test for a criminal trademark violation to the test used in the civil context. There certainly is no indication that Congress intended for the § 2320(d)(1)(A)(iii) test to be more restrictive than is the test under the Lanham Act. As Congress observed in the *Joint Statement, supra*:
    Proposed subsection 18 U.S.C. § 2320(d)(1)(A)(iii) states that 'counterfeit mark' must be one the use of which is likely 'to cause confusion, to cause mistake, or to deceive.' This is the key phrase in the remedial section of the Lanham Act, 15 U.S.C. § 1114, and its inclusion here is intended to ensure that no conduct will be criminalized by this act that does not constitute trademark infringement under the Lanham Act. *As a practical matter, however, this element should be easily satisfied if the other elements of a 'counterfeit mark' have been proven—since a counterfeit mark is the most egregious example of a mark that 'is likely to cause confusion'.*

No. 997, at 12; *Joint Statement on Trademark Counterfeiting Legislation,* Cong. Rec. H12,078 (daily ed. Oct. 10, 1984) [hereinafter *Joint Statement*]. In our view, Congress thereby manifested its intent that section 2320(d)(1)(A)(iii) be given the same interpretation as is given the identical language in section 1114(1) of the Lanham Act. *See* H.R.Rep. No. 997, at 8, 12; *Joint Statement,* Cong.Rec. at H12,078; *see also United States v. Gonzalez,* 630 F.Supp. 894, 896 (S.D.Fla.1986).

The current version of section 1114(1) of the Lanham Act differs from the original version in that it does not contain the likely to confuse direct purchasers requirement of the original section. Courts interpreting the current version of section 1114(1) have held that the section does not require a showing that direct purchasers would be likely to be confused, mistaken or deceived. Instead, they construe section 1114(1) to require simply the likely confusion of the purchasing public—a term that includes individuals who are potential purchasers of the trademark holders goods as well as those who are potential direct purchasers of the allegedly counterfeit goods. *Levi Strauss v. Blue Bell, Inc.,* 632 F.2d 817, 822 (9th Cir.1980); *Amp Inc. v. Foy,* 540 F.2d 1181, 1183 (4th Cir.1976); *Rolex Watch U.S.A. v. Canner,* 645 F.Supp. 484, 492 (S.D.Fla.1986); *Rolls-Royce Motors,* 428 F.Supp. at 695–96 & n. 10; *see Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.,* 510 F.2d 1004, 1012 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975); [5] *Syntex Laboratories,* 437 F.2d at 568; *see also John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 972 (11th Cir.1983) (the test is whether there is a likelihood of confusion between the registered mark and the allegedly infringing mark).

Given our conclusion that section 2320(d)(1)(A)(iii) should be interpreted similarly to the identical language in section 1114(1), we hold that section 2320(d)(1)(A)(iii) also is satisfied when the use of the mark in connection with the goods or services in question would be likely to confuse the purchasing public. *See United States v. Infurnari,* 647 F.Supp. 57, 59–60 (W.D.N.Y.1986); *Gonzalez,* 630 F.Supp. at 896.

**B.** *Post-Sale Context*

In its order the district court also concluded that the likelihood of post-sale confusion is irrelevant to the section 2320(d)(1)(A)(iii) inquiry. We disagree.

Under section 1114(1) of the Lanham Act, the likely to confuse test is satisfied when potential purchasers of the trademark holder's products would be likely to be confused should they encounter the allegedly counterfeit goods in a post-sale context—for example, in a direct purchaser's possession. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 871, 872–73 (2d Cir.1986); *Blue Bell,* 632 F.2d at 822; *Rolex Watch,* 645 F.Supp. at 488, 493–495; *Rolls-Royce Motors,* 428 F.Supp. at 694; *see Syntex Laboratories,* 437 F.2d at 568 (likelihood of confusion need not be that of purchasers, any kind of likelihood of confusion is sufficient); *see also Boston Professional Hockey Ass'n,* 510 F.2d at 1012 (the likely to confuse standard is met where defendant duplicated and sold protected trademarks to the public knowing the public would identify them as those of the trademark holder). Consequently we conclude that the likely to confuse test of section 2320(d)(1)(A)(iii) also is satisfied by a showing that it is likely that members of the public would be confused, mistaken or deceived should they encounter the allegedly counterfeit goods in a post-sale context. *See Infurnari,* 647 F.Supp. at 59–60; *Gonzalez,* 630 F.Supp. at 896.

This conclusion is supported by the policy goals of the Trademark Counterfeiting Act. Like the Lanham Act, the Trademark Counterfeiting Act is not simply an

---

Cong.Rec. at H12,078 (emphasis added).

**5.** The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

anti-consumer fraud statute. *See Infurnari*, 647 F.Supp. at 59–60; *Gonzalez*, 630 F.Supp. 896. Rather, a central policy goal of the Act is to protect trademark holders' ability to use their marks to identify themselves to their customers and to link that identity to their reputations for quality goods and services.[6] S.Rep. No. 526, at 1–2, 4–5, 1984 U.S.Code Cong. & Admin. News, at 3627–28, 3630–31; H.R.Rep. No. 997, at 5–6; *see Infurnari*, 647 F.Supp. at 59–60; *Gonzalez*, 630 F.Supp. at 896; *see also Lois Sportswear*, 799 F.2d at 872 (same conclusion with respect to the Lanham Act), *E. Remy Martin & Co. v. Shaw-Ross International Imports, Inc.*, 756 F.2d 1525, 1530 (11th Cir.1985) (same); *Rolex Watch*, 645 F.Supp. 488, at 493–495 (same).

It is essential to the Act's ability to serve this goal that the likely to confuse standard be interpreted to include post-sale confusion. A trademark holder's ability to use its mark to symbolize its reputation is harmed when potential purchasers of its goods see unauthentic goods and identify these goods with the trademark holder. H.R.Rep. No. 997, at 5–6; *see Lois Sportswear*, 799 F.2d at 872–73; *Remy Martin*,

756 F.2d at 1530; *Grotrian, Helffrich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1342 (2d Cir.1975). This harm to trademark holders is no less serious when potential purchasers encounter these counterfeit goods in a post-sale context. *See Lois Sportswear*, 799 F.2d at 872–73; *Steinway*, 523 F.2d at 1342; *Blue Bell*, 632 F.2d at 822; *Rolex Watch*, 645 F.Supp. at 494–95; *Gonzalez*, 630 F.Supp. 896. Moreover, verbal disclaimers by sellers of counterfeit goods do not prevent this harm.[7]

## III. WHETHER DISMISSAL IS APPROPRIATE

Based on the discussion above, we conclude that the district court employed the wrong legal standard when it dismissed the indictment on the ground that the government could not show that it is likely that direct purchasers would be confused, mistaken or deceived. This error does not in and of itself necessitate reversal of the district court, however. Reversal is required in this case because we find that, under the proper legal standard, dismissal of the indictment is improper.[8]

6. It also is important to recognize that the enforcement of trademark laws benefits consumers even in cases where there is no possibility that consumers will be defrauded. For, to the extent that trademarks provide a means for the public to distinguish between manufacturers, they also provide incentives for manufacturers to provide quality goods. *See U.S. International Trade Commission's Final Report on Investigation No. 332–158 Under Section 332(b) of the Tariff Act of 1930, The Effects of Foreign Product Counterfeiting on United States Industry*, U.S. Int'l Trade Comm'n Pub. 1479, *reprinted in part in* 82 Pat. & Trademark Rev. 471, 483 (1984). Traffickers of these counterfeit goods, however, attract some customers who would otherwise purchase the authentic goods. Trademark holders' returns to their investments in quality are thereby reduced. This reduction in profits may cause trademark holders to decrease their investments in quality below what they would spend were there no counterfeit goods. This in turn harms those consumers who wish to purchase higher quality goods.

7. Moreover, it should be noted that under early versions of § 2320 the defendant was not liable unless he had used the counterfeit mark with the *intent* to deceive or defraud. S. 875, 98th Cong., 1st Sess. (March 22, 1983); H.R. 2447, 98th Cong., 1st Sess. (April 7, 1983). Congress

omitted this requirement from subsequent versions of the section. We conclude that Congress omitted this requirement because such a requirement would undermine the section's essential goal of protecting trademark holders as trademark holders are injured by counterfeits even when consumers are not defrauded. *See* H.R.Rep. No. 997, at 5–6. In particular, we conclude that Congress in removing the intent requirement shifted the focus of the § 2320 inquiry from a concern solely for the direct purchasers of counterfeit goods to a concern for protecting trademark holders' interests. Our interpretation of § 2320(d)(1)(A)(iii) serves this latter concern.

8. Although we conclude that the district court employed the wrong legal standard, we also note that under the district court's own interpretation of § 2320(d)(1)(A)(iii) dismissal of the indictment was improper. It was for a jury, not for the court, to determine whether the price differential between the replica and the authentic Rolex watches was so great that it was unlikely that a direct purchaser would be confused, mistaken or deceived. *Gonzalez*, 630 F.Supp. at 896 (declining to dismiss an indictment on this ground in a factually similar case); *see Marathon Mfg. Co. v. Enerlite Prods. Corp.*, 767 F.2d 214, 217 (5th Cir.1985) (under the

■ Under Fed.R.Crim.P. 12(b) an indictment may be dismissed where there is an infirmity of law in the prosecution; a court may not dismiss an indictment, however, on a determination of facts that should have been developed at trial. *United States v. Korn*, 557 F.2d 1089, 1090–91 (5th Cir. 1977); *see United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078, 1082 (5th Cir.) (on a motion to dismiss the indictment the district court must not pierce the pleadings or make a premature resolution of the merits of the allegations), *cert. denied*, 437 U.S. 903, 98 S.Ct. 3088, 57 L.Ed.2d 1133 (1978).

■ On review, this court must reverse a dismissal if it concludes that the factual allegations in the indictment, when viewed in the light most favorable to the government, were sufficient to charge the offense as a matter of law. *See United States v. Mann*, 517 F.2d 259, 266 (5th Cir.1975), *cert. denied*, 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976); *see also Cadillac Overall Supply*, 568 F.2d at 1082 (on a motion to dismiss an indictment the district court must take the allegations to be true).

■ This circuit has defined seven factors that should be considered when analyzing whether there is a likelihood of confusion between two marks under section 1114(1) of the Lanham Act, *John H. Harland*, 711 F.2d at 972; we now employ these factors here. These factors are: (1) the type of trademark, (2) the similarity of design, (3) the similarity of product, (4) the identity of retail outlets and purchasers, (5) the similarity of advertising media used, (6) defendant's intent and (7) actual confusion. *Id.* at 972; *see Univ. of Georgia Athletic Ass'n v. Laite*, 756 F.2d 1535, 1542 (11th Cir.1985) (employing the same seven factors in determining likelihood of confu-

sion under section 43(a) of the Lanham Act).

■ None of these factors, however, is essential to a finding of likely confusion. *See Marathon Mfg. Co. v. Enerlite Prods. Corp.*, 767 F.2d 214, 218 (5th Cir.1985); *John H. Harland Co.*, 711 F.2d at 973. Rather, the likely to confuse determination involves a weighing of the seven factors. This determination therefore is generally a question of fact. *See Marathon Mfg.*, 767 F.2d at 217; *Conagra v. Singleton*, 743 F.2d 1508, 1514 (11th Cir.1984); *John H. Harland Co.*, 711 F.2d at 973; *Boston Professional Hockey Ass'n*, 510 F.2d at 1012.

■ Given our conclusions that a likelihood of post-sale confusion satisfies section 2320(d)(1)(A)(iii) and that the determination of whether there is a likelihood of confusion should be based on the above seven factor test, we hold that the district court was incorrect in granting the motion to dismiss the indictment in the instant case. In addition to an indictment that alleges all the elements of the crime, the district court had before it evidence that the allegedly counterfeit watches are externally identical to authentic Rolex watches and bear both the name "Rolex" and the Rolex crown trademark emblem. This evidence that the allegedly counterfeit watches bear Rolex's trademark, are of identical design, and are the same type of product is sufficient to support the allegation that the marks used in connection with the replica Rolex watches are likely to cause the purchasing public to be confused, mistaken or deceived. *See Infurnari*, 647 F.Supp. at 59–60; *Gonzalez*, 630 F.Supp. at 895–96; *see also Rolls-Royce*, 428 F.Supp. at 695 (granting summary judgment in part for plaintiff on similar facts). This evidence therefore is at least sufficient to enable the government to overcome the motion to dis-

---

Lanham Act the likely to confuse determination is a factual one involving the weighing of seven factors); *John H. Harland*, 711 F.2d at 973 (same). Although this price differential may be relevant to the determination of whether the mark is likely to confuse, it is simply one of many factors to be considered. It is not dispositive. *Gonzalez*, 630 F.Supp. at 896; *see Informa-*

*tion Clearing House Inc. v. Find Magazine*, 492 F.Supp. 147, 158 n. 32 (S.D.N.Y.1980) (price differential is only a factor to consider in making a likely to confuse determination under the Lanham Act); *see also Marathon*, 767 F.2d at 218 (in Lanham Act cases, none of the factors to be considered in determining whether there is likelihood of confusion is dispositive).

miss the indictment.[9] *See Infurnari,* 647 F.Supp. at 60 (declining to dismiss an indictment based on similar facts); *Gonzalez,* 630 F.Supp. at 896 (same).

We therefore hold that the district court erred in dismissing the indictment because it was incorrect in concluding that the marks are not counterfeit as a matter of law. Accordingly, we REVERSE the dismissal of the indictment and REMAND.

REVERSED and REMANDED.

---

9. Although defendant claims that he did not intend to "palm off" the replica Rolexes as being authentic, it appears that he intended to traffic in goods that he knew would be desirable to consumers because the goods would be identified by the public as those of the authentic trademark owner. In the civil context, courts have indicated that this fact alone may be sufficient to establish likelihood of confusion. *John H. Harland,* 711 F.2d at 977; *Louisiana World Exposition, Inc. v. Logue,* 746 F.2d 1033, 1041 (5th Cir.1984); *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 263 (5th Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980); *Rolex Watch U.S.A., Inc. v. Canner,* 645 F.Supp. 484, 490–92 (S.D.Fla.1986); *see Univ. of Georgia Athletic Ass'n v. Laite,* 756 F.2d 1535, 1545 (11th Cir.1985) (defendant's intent to benefit from identification with trademark holder plus similarity of design between the two marks would be sufficient to establish likelihood of confusion under the Lanham Act). We need not decide whether defendant's intent to benefit from the trademark holder's reputation can ever be dispositive of the likelihood of confusion issue in the criminal context. We do find this intent to be relevant, however.