UNITED STATES of America, Appellee,

v.

Nam Ping HON, Defendant–Appellant.

No. 655, Docket 89–1424.

United States Court of Appeals,
Second Circuit.

Argued Jan. 22, 1990.

Decided May 21, 1990.

Adina Schwartz, New York City (The Legal Aid Soc., Federal Defender Services Unit, New York City, of counsel), for defendant-appellant.

Jeffrey B. Sklaroff, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty. for the S.D. of N.Y., David E. Brod-

sky, Asst. U.S. Atty., of counsel), for appellee.

Before KEARSE, MINER and WALKER, Circuit Judges.

WALKER, Circuit Judge:

Nam Ping Hon appeals from his conviction, after a jury trial in the United States District Court for the Southern District of New York (Robert W. Sweet, *Judge*), on two counts of trafficking and attempting to traffic in wrist watches bearing prestige-brand counterfeit trademarks, in violation of 18 U.S.C. § 2320. Hon's primary argument is that Judge Sweet erred when he instructed the jury on the "likely to confuse" element of section 2320 that it could consider the confusion of members of the non-purchasing public in addition to actual or potential purchasers. Because we conclude that Judge Sweet's charge was appropriate, and because we find Hon's other claims to be without merit, we affirm.

## BACKGROUND

In early 1988, undercover agents of the United States Customs Service, seeking to buy counterfeit watches, made contact with Nam Ping Hon and his wife Sandy Hon who had imitation Rolex, Gucci, Piaget and Movado watches for sale at prices ranging between $13 and $17. The watches generally bore a close resemblance to the genuine article and carried an identical or nearly identical trademark, but their quality of manufacture was poor.

On January 25, 1988, the agents purchased eight counterfeit watches at the Hons' place of business at 326 Canal Street in New York City and told the Hons that, if these were satisfactory, they would purchase a much larger quantity. Through the spring and summer, the agents kept sporadic contact with the Hons. On August 23, Sandy Hon agreed to sell Agent Bonnie Goldblatt 1,200 counterfeit watches at 8:00 a.m. on August 25. Sandy said that Nam Ping Hon would be with her and gave the agent a list of the styles and prices involved. The total price for the watches was $17,200, an average price of $14.33 per watch.

On the morning of August 25, 1988, Nam Ping Hon, accompanied by Sandy Hon and carrying two shopping bags he had taken from his car, met Agent Goldblatt outside his Canal Street address. Both Hons separately indicated that the watches were in the bags. Agent Goldblatt said that she had seen police nearby and suggested that they complete the transaction elsewhere. Sandy went in a car with Agent Goldblatt and Special Agent Blaise Piazza to the pre-arranged spot. Nam Ping left on foot with the two shopping bags. When the group reconvened, Sandy and Nam Ping conferred separately. Sandy returned alone to the agents and said that the deal was off. The agents arrested Sandy Hon and, shortly thereafter, Nam Ping Hon.

A surveillance agent found and, as authorized by 19 U.S.C. § 1595a, seized Hon's car and took the two shopping bags—containing 889 counterfeit watches—from the trunk. Searches ensued at 326 Canal Street with a warrant, and at 325 Canal Street and Hon's home on consent. The agents seized a total of 2,600 counterfeit watches from these locations and found $68,000 in cash in a bedroom closet.

The Hons were charged with one count of conspiracy under 18 U.S.C. § 371 and three counts of trafficking and attempting to traffic in counterfeit watches, in violation of 18 U.S.C. §§ 2320 and 2. Sandy Hon pled guilty to all counts and was sentenced to 36 months probation, a $6,000 fine and a $200 special assessment. A jury found Nam Ping Hon guilty of two of the counts of trafficking and attempting to traffic. Judge Sweet sentenced Hon to five months imprisonment, five months in a community treatment center, a $3,000 fine and a $100 special assessment.

## DISCUSSION

### I.

■ Hon's principal argument on appeal is that Judge Sweet erred when he charged the jury that they could find "likelihood of confusion," an element of 18 U.S.C. § 2320,

"either among the members of the purchasing public or among the members of the nonpurchasing public ... [including] persons who have no intention of purchasing a watch, such as the recipient of a gift or someone who simply views the watch."[1] Hon argues that this instruction was based upon an erroneous interpretation of both section 2320 and the civil Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, whose confusion requirement was incorporated into section 2320. Hon asserts that Second Circuit authority interpreting the Lanham Act—including *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), and its progeny—compels the conclusion that trademark confusion is limited to purchasers and potential purchasers.

We note at the outset that the discrepancy between Judge Sweet's charge and one Hon would favor is quite likely to be material in a case such as this. A purchaser or potential purchaser would invest at least minimal effort in examining the counterfeit watch in question and, based on the differences he would discover in price and quality of manufacture between the counterfeit and the genuine item, would probably not be confused as to the watch's origin. However, a casual observer viewing a counterfeit watch, on the wrist of a friend, for instance, could easily be confused.

Section 2320, enacted as the Trademark Counterfeiting Act of 1984, punishes "[w]hoever intentionally traffics or attempts to traffic in goods or services and knowingly uses a counterfeit mark on or in connection with such goods or services." "Counterfeit mark" is defined, in pertinent part, as:

a spurious mark—

(i) that is used in connection with trafficking in goods or services;

(ii) that is identical with, or substantially indistinguishable from, a mark registered for those goods or services on the principal register in the United States Patent and Trademark Office and in use ...; and

(iii) the use of which is likely to cause confusion, to cause mistake, or to deceive.

There is no doubt that Congress wished to incorporate the Lanham Act's confusion requirement into 18 U.S.C. § 2320 and did so. *See* 15 U.S.C. § 1114(1). As stated by the chief House and Senate sponsors of the Trademark Counterfeiting Act,

likely "to cause confusion, to cause mistake, or to deceive," ... is the key phrase in the remedial section of the Lanham Act ... and its inclusion here is intended to ensure that no conduct will be criminalized by this act that does not constitute trademark infringement under the Lanham Act.

*Joint Statement on Trademark Counterfeiting Legislation*, 130 Cong.Rec. 31,673, 31,675 (1984). *See also United States v. Torkington*, 812 F.2d 1347, 1351–52 & n. 4 (11th Cir.1987); *United States v. Gonzalez*, 630 F.Supp. 894, 896 (S.D.Fla.1986).

■ Hon argues that the confusion requirement under 18 U.S.C. § 2320 must be read more narrowly than its Lanham Act counterpart because "Congress intended that the criminal act be narrower in scope than the Lanham Act and prohibit only 'egregious' instances of the conduct that the civil statute prohibits." While we agree with Hon's characterization of congressional intent, the conclusion he urges does not follow. Egregiousness is ground-

---

1. The relevant portion of Judge Sweet's charge is:

And in addition, the government does not have to prove that the direct purchasers, in this case the undercover agents, were confused, mistaken or deceived when they bought the watches from Hon. Rather, the government must establish a likelihood of confusion either among the members of the purchasing public or among the members of the non-purchasing public in the post sale context.

Putting it differently, thus, to assess this likelihood of confusion, you can consider the potential for confusion, mistake or deception among purchasers and potential purchasers of counterfeit or authentic watches, as well as among persons who have no intention of purchasing a watch, such as the recipient of a gift or someone who simply views the watch.

ed not upon whether the person deceived is a purchaser or potential purchaser but whether the mark is a counterfeit and is knowingly used as such.

■ Section 2320 is, of course, "narrower" than the Lanham Act provision. Section 2320 proscribes only the use of counterfeits—marks "identical with, or substantially indistinguishable from" a registered trademark—while Lanham Act liability may rest upon not only a "counterfeit" but also a "reproduction," "copy" or "colorable imitation." Section 2320 is also narrower than the Lanham Act because it requires proof of criminal intent. In fact, section 2320's *mens rea* requirement is dual: the defendant must intend to traffic or attempt to traffic in goods and services *and* knowingly use a counterfeit mark on or in connection with such goods or services. *See* S.Rep. No. 98–526, 98th Cong., 2d Sess. 11 (1984), *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3627, 3637.

■ The legislative history of 18 U.S.C. § 2320 supports our view that the statute reaches public, non-purchaser confusion. Congress enacted section 2320 in response to an increasing tide of commercial trademark counterfeiting and wished to impose stiff criminal penalties upon those whose intentional acts were previously subject only to civil sanctions under the Lanham Act. *See* S.Rep. No. 98–526, *supra,* at 3–6, *reprinted in* 1984 U.S.Code Cong. & Admin.News at 3629–32. The Senate Report cited our observation in *Montres Rolex, S.A. v. Snyder,* 718 F.2d 524, 528 (2d Cir. 1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984), that "[c]ommercial counterfeiting has reached epidemic proportions.... [T]he owners of trademarks on prestige items are particularly likely to be plagued by recurring counterfeit problems," and specifically stated that the criminal counterfeiting act was designed to help stem this epidemic. S.Rep. No. 98–526, *supra,* at 5, *reprinted in* 1984 U.S.Code Cong. & Admin.News at 3631.

Congress was concerned not only that "[t]rademark counterfeiting ... defrauds purchasers, who pay for brand-name quality and take home only a fake," but also that "counterfeiters [can earn] enormous profits ... by capitalizing on the reputations, development costs, and advertising efforts of honest manufacturers at little expense to themselves." S.Rep. No. 98–526, *supra,* at 4–5, *reprinted in* 1984 U.S. Code Cong. & Admin.News at 3630–31.

Courts have widely agreed that 18 U.S.C. § 2320 is " 'not just designed for the protection of consumers. [It is] likewise fashioned for the protection of trademarks themselves and for the prevention of the cheapening and dilution of the genuine product.' " *United States v. Yamin,* 868 F.2d 130, 132–33 (5th Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 3258, 106 L.Ed.2d 603 (1989) (quoting *United States v. Gonzalez,* 630 F.Supp. at 896); *United States v. Gantos,* 817 F.2d 41, 43 (8th Cir.), *cert. denied,* 484 U.S. 860, 108 S.Ct. 175, 98 L.Ed.2d 128 (1987) (same). *See also United States v. Torkington,* 812 F.2d at 1353 ("[A] central policy goal of [section 2320] is to protect trademark holders' ability to use their marks to identify themselves to their customers....").

In the Lanham Act context, we have stated, "[t]he trademark laws are designed not only to prevent consumer confusion but also to protect 'the synonymous right of a trademark owner to control his product's reputation.' " *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 205 (2d Cir.1979) (citation omitted). *See also A.T. Cross Co. v. Jonathan Bradley Pens, Inc.,* 470 F.2d 689, 692 (2d Cir.1972); *Syntex Laboratories, Inc. v. Norwich Pharmacal Co.,* 437 F.2d 566, 568–69 (2d Cir.1971); *Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-Le Coultre Watches, Inc.,* 221 F.2d 464, 466 (2d Cir.), *cert. denied,* 350 U.S. 832, 76 S.Ct. 67, 100 L.Ed. 743 (1955).

Thus an interpretation of section 2320's confusion requirement to include the non-purchasing public advances the important purpose underlying the trademark laws of protecting the trademark owner's investment in the quality of the mark and his product's reputation, one that is independent of the goal of preventing consumer deception.

The courts in our sister circuits that have addressed the confusion requirement of 18 U.S.C. § 2320 have uniformly rejected Hon's position. *See United States v. Yamin*, 868 F.2d 130 (5th Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 3258, 106 L.Ed.2d 603 (1989); *United States v. Gantos*, 817 F.2d 41 (8th Cir.), *cert. denied*, 484 U.S. 860, 108 S.Ct. 175, 98 L.Ed.2d 128 (1987); *United States v. Torkington*, 812 F.2d 1347 (11th Cir.1987). *See also United States v. Infurnari*, 647 F.Supp. 57 (W.D.N.Y.1986); *United States v. Gonzalez*, 630 F.Supp. 894 (S.D.Fla.1986). In *Yamin* the Fifth Circuit, affirming the convictions of two defendants for trafficking in counterfeit Rolex, Piaget, Cartier and Gucci watches, held that "[t]he statute's application is not restricted to instances in which direct purchasers are confused or deceived by the counterfeit goods." 868 F.2d at 132. The court found a jury instruction not to be plain error that included confusion "of the public in general.... [which] includes persons who have no intent to purchase such as the recipient of a gift or the guest in the house who simply views goods as well as purchasers and potential purchasers." *Id.*

In *Torkington*, also a counterfeit watch trafficking case, section 2320's confusion requirement was "satisfied by a showing that it is likely that members of the public would be confused, mistaken or deceived should they encounter the allegedly counterfeit goods in a post-sale context." 812 F.2d at 1352 (citations omitted). The court also found relevant to likelihood of confusion that the defendant "intended to traffic in goods that he knew would be desirable to consumers because the goods would be identified by the public as those of the authentic trademark owner." *Id.* at 1355 n. 9. *See also Gantos*, 817 F.2d at 43.

Although this is the first instance in which we have been called upon to address section 2320's confusion requirement, the broader confusion standard adopted by the district court has support in our previous decisions interpreting the Lanham Act. In *Syntex Laboratories*, presented with a possible infringement between health care products with similar but not identical names, we noted that Congress' 1962 amendment of the "likely to confuse" language in the Lanham Act "evinc[ed] a clear purpose to outlaw the use of trademarks which are likely to cause confusion, mistake, or deception of any kind, not merely of purchasers nor simply as to source of origin." 437 F.2d at 568.[2]

At least as far back as *G.H. Mumm Champagne v. Eastern Wine Corp.*, 142 F.2d 499 (2d Cir.), *cert. denied*, 323 U.S. 715, 65 S.Ct. 41, 89 L.Ed. 575 (1944), a case where a cheap domestic champagne's label resembled that of the plaintiff's premium French import, we have recognized nonpurchaser confusion as relevant. In the words of Judge Learned Hand,

> as an evening wears on, the label, and only a very casual glance at the label, is quite enough to assure the host and his table that he remains as free-handed and careless of cost as when he began. At such stages of an entertainment nothing will be easier than for an unscrupulous restaurant keeper to substitute the domestic champagne.

*Id.* at 501. *See also A.T. Cross Co.*, 470 F.2d at 692 (Friendly, J.) (noting relevance of trademark infringer's "attempt at persuading purchasers that their donees would think they were receiving Cross pens"); *Mastercrafters Clock & Radio Co.*, 221 F.2d at 466 (trademark copier liable when "at least ... some customers would buy [the] cheaper clock for the purpose of acquiring the prestige gained by displaying what many visitors at the customers' homes would regard as a prestigious article").

---

2. The pre–1962 version of the confusion requirement in section 1114(1) read, "is likely to cause confusion, or to cause mistake, or to deceive *purchasers as to the source of origin of such goods or services*" (emphasis added). The amendment eliminated the italicized portion. As Hon points out, the Senate Report suggests that the amendment's purpose was to make clear that the confusion requirement includes potential purchasers as well as actual purchasers. *See* S.Rep. No. 87–2107, 87th Cong., 2nd Sess., *reprinted in* 1962 U.S.Code Cong. & Admin.News 2844, 2847, 2850–51. Still, nothing in the legislative history or the statute as amended excludes from its reach public, nonpurchaser confusion in the case of counterfeits.

Courts outside our circuit have also extended Lanham Act confusion to the public at large. *See AMP Inc. v. Foy,* 540 F.2d 1181, 1183 (4th Cir.1976); *Rolex Watch U.S.A., Inc. v. Canner,* 645 F.Supp. 484, 492–93 (S.D.Fla.1986); *Koppers Co. v. Krupp–Koppers GmbH,* 517 F.Supp. 836, 844 (W.D.Pa.1981); *T & T Mfg. Co. v. A.T. Cross Co.,* 449 F.Supp. 813, 823 (D.R.I.), *aff'd,* 587 F.2d 533 (1st Cir.1978), *cert. denied,* 441 U.S. 908, 99 S.Ct. 2000, 60 L.Ed.2d 377 (1979); *Rolls–Royce Motors, Ltd. v. A & A Fiberglass, Inc.,* 428 F.Supp. 689, 694 & n. 10 (N.D.Ga.1977).

Hon points to language appearing in some of our prior Lanham Act decisions that he says stands for the proposition that the relevant confusion is that of purchasers or potential purchasers. *See Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979) (crucial issue is "whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question"); *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961) (in eight-factor test for confusion, relevant group assumed to be persons in the market for defendant's products). *See also Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1225–28 (2d Cir.1987); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 871–73 (2d Cir.1986); *McGregor–Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1130–38 (2d Cir.1979); *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,* 523 F.2d 1331, 1339–42 (2d Cir.1975).

These cases do not assist the appellant. None hold that confusion among the general public is never relevant under the Lanham Act. Most—*Polaroid, Mushroom Makers, Centaur Communications,* and *McGregor–Doniger*—raise the question whether the second mark on a different, non-competing product creates a likelihood of confusion as to the source or origin of the product and are far removed from the counterfeit context presented here. The two others, *Lois Sportswear* and *Steinway,* while also not counterfeit cases are closer since the similar marks are on the same product—jeans and pianos, respectively. But in both cases ample purchaser confusion was present, so the courts did not have to consider confusion of the public at large. Finally, there is no suggestion in the legislative history of 18 U.S.C. § 2320 that Congress intended to incorporate Hon's reading of the *Polaroid* line of cases into its understanding of the confusion requirement it was enacting.

In the Lanham Act context, we have remarked that a case where the products are the same "does not require a weighing of the many conflicting considerations necessary in trademark cases where the products are different." *A.T. Cross Co.,* 470 F.2d at 692 (Friendly, J., distinguishing his earlier *Polaroid* opinion). Indeed the non-exclusive *Polaroid* factors themselves—strength of prior owner's mark, degree of similarity between the two marks, proximity of the products, likelihood that prior owner will bridge the gap, actual confusion, defendant's good faith, quality of defendant's product, sophistication of the buyers—are designed to assess infringement "[w]here the products are different." 287 F.2d at 495.

Where the products are identical and the jury has concluded that the defendant has met the two-pronged *mens rea* standard of section 2320, a requirement that confusion among actual or potential purchasers be shown is unnecessary. Because the purposes of the trademark laws include protection of the integrity of the mark itself, as well as prevention of consumer fraud, we hold that the "likely to confuse" standard of 18 U.S.C. § 2320 is not limited to purchasers or potential purchasers. Therefore, we conclude that Judge Sweet did not err when he charged the jury that they could consider non-purchaser confusion.

## II.

 Hon argues that even if we approve Judge Sweet's charge we must still reverse

the conviction because the charge effectively eliminated the confusion requirement and thus nullified his due process right to proof beyond a reasonable doubt of each element of the offense, or because the charge amounted to a partial directed verdict on that issue, thus abridging his sixth amendment right to a jury trial in a serious criminal case. We reject these arguments.

First, we do not accept that the charge had the effect ascribed to it by Hon. Even though Judge Sweet, out of the jury's presence, voiced a belief that as a practical matter his instruction "eliminated" the confusion requirement, the charge the jury heard still required them to find a likelihood of confusion as an element of the offense. The jury was free to find no likelihood of confusion, perhaps by deciding that the genuine and counterfeit watches in evidence were not so indistinguishable as to create a "likelihood" of confusion, even among casual observers. Moreover, even if Judge Sweet's charge made a jury finding of no likelihood of confusion highly improbable on these facts, Hon's constitutional right to a jury finding was not impaired. A defendant is not entitled to a jury charge simply to create a reasonable doubt when on the facts and the law as correctly applied there should be none.

Hon also argues that Judge Sweet's charge rendered the statute unconstitutionally vague as applied because the instructions did not refer to the "ordinary prudent purchaser" or the "reasonable man," and thus "provided absolutely no guidelines as to *whose* potential confusion the jury should consider." This argument is frivolous. The charge itself is clear regarding the types of people whose confusion can be considered. Moreover, we fail to see how the statute would be any less vague had the judge charged the jury in the manner Hon urges, i.e., letting them consider the confusion only of an ordinary prudent purchaser or potential purchaser—given the uncertainty inherent in a concept such as "potential purchaser."

Hon asserts that Judge Sweet "precluded a commonsense interpretation of whose confusion was relevant" by his comments to counsel that the confusion of even a "cretin observer" would be relevant. But such comments were not heard by the jury, and the charge on its face fairly asks for a commonsense interpretation, in which a reasonableness standard is implicit. *See United States v. Powell,* 423 U.S. 87, 93–94, 96 S.Ct. 316, 320, 46 L.Ed.2d 228 (1975). *Accord United States v. McEvoy,* 820 F.2d 1170, 1172–73 (11th Cir.), *cert. denied,* 484 U.S. 902, 108 S.Ct. 243, 98 L.Ed.2d 201 (1987) (section 2320 not unconstitutionally vague on its face). "[S]training to inject doubt as to the meaning of words where no doubt would be felt by the normal reader is not required by the 'void for vagueness' doctrine, and we will not indulge in it." *Powell,* 423 U.S. at 93, 96 S.Ct. at 320.

### III.

Finally, Hon argues that the "chain of custody" proof was insufficient to warrant the district court's admission into evidence of certain watches.[3] This argument is meritless.

As Hon concedes, Fed.R.Evid. 901 requires that to meet the admissibility threshold the government need only prove a rational basis for concluding that an exhibit is what it is claimed to be. *United States v. Casamento,* 887 F.2d 1141, 1188 (2d Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990); *United States v. Mendel,* 746 F.2d 155, 167 (2d Cir.1984), *cert. denied,* 469 U.S. 1213, 105 S.Ct. 1184, 84 L.Ed.2d 331 (1985). *See also United States v. S.B. Penick & Co.,* 136 F.2d 413, 415 (2d Cir.1943) (judge must

**3.** Hon cites evidence that an evidence bag bore a label with an incorrect case number; that the watches in that bag were initially carried loose in the pockets of an agent who was not called as a witness; that the bag was left open for several months in an unlocked desk drawer; that certain other evidence bags and boxes when initially received from the seizing agent may have been left uncounted for several days in an office to which many agents had access; that these bags were never actually sealed when placed in an evidence room to which many persons had access; that no written records were kept of who had custody of various items in the evidence room or when various items entered or left the room.

be satisfied that "in reasonable probability the article has not been changed in important respects").[4]

The government more than adequately demonstrated such a rational basis in this case. Although the government, with greater care in handling the exhibits, could have avoided the issue, any "weaknesses" in the government's chain of custody were insufficient to offset the ample evidence supporting admission of the watches. Once the exhibits were admitted into evidence, the alleged defects in the government's chain of custody proof were for the jury to evaluate in its consideration of the weight to be given to the evidence. *See United States v. Johnson*, 513 F.2d 819, 822 n. 1 (2d Cir.1975); *S.B. Penick & Co.*, 136 F.2d at 415. *See also* Fed.R.Evid. 901, Advisory Committee's Note at [1]-(a) (authentication and identification represent a special aspect of relevancy, governed by the procedure of Fed.R.Evid. 104(b)).

Agent Goldblatt, who purchased the eight watches on January 25, 1988, testified that immediately after the purchase she and her partner brought the watches back to the Customs House, where she placed them in an evidence bag and sealed and labelled it, indicating date and time of purchase and a description of contents. She stored the bag in a locked cabinet in her office, removed it a week later so that the watches could be certified as counterfeit, and then placed the watches back into the bag and resealed it. Agent Piazza, who received the stapled evidence bag from Goldblatt, kept it in his desk, which contained no other evidence of any kind. He took it out on only one occasion when he broke the seal to examine the contents, and then returned the bag, albeit unsealed, to his desk. Goldblatt also testified at trial that she could identify the eight watches as those she purchased from the Hons by the watches themselves, the label on the bag,

and the receipt she received at the time of purchase. The incorrect case number on the label arose because Agent Goldblatt mistakenly wrote a "6" instead of a "2" for the ninth digit of the case number.

Regarding the watches seized from the trunk of the Hons' car on August 25, 1988, one agent testified that he and his partner physically handed the items to Agent Piazza on that day. Agent Piazza testified that he first locked the watches in his supervisor's office, then in one evidence room and then in a different evidence room, until he brought the exhibits to the U.S. Attorney's office for trial preparation. Although Piazza apparently sealed only the boxes and not the bags, Piazza stated that he covered the rolled-up bags with the boxes when he placed them in the two evidence rooms and found the bags in their original positions when he retrieved them from the rooms.

The prosecution is not required to "exclude all possibility that the article may have been tampered with." *S.B. Penick & Co.*, 136 F.2d at 415. *See Johnson*, 513 F.2d at 822 n. 1. Given the ample evidence offered by the government to demonstrate that the exhibits were what they were claimed to be, we conclude that the district court did not abuse its discretion in admitting them into evidence.

Judgment affirmed.

---

4. Hon cites a Seventh Circuit case, *United States v. Lampson*, 627 F.2d 62, 65 (7th Cir.1980), for the proposition that when the issue concerns the very identity of the evidence, rather than just possible changes in its condition, heightened scrutiny is appropriate for chain of custody claims. Even if this Circuit were to adopt such a principle, which we need not decide here, we do not believe that this case involves "the very identity of the evidence" as opposed to changes in its condition. Moreover, we believe that the evidence of authentication in this case would support admissibility of the watches even under a heightened standard.