**Jeff FOXWORTHY**

v.

**CUSTOM TEES, INC., and Stewart R. Friedman**[1].

**No. 1:94–CV–3477–RCF.**

United States District Court, N.D. Georgia, Atlanta Division.

March 6, 1995.

---

1. Defendant CPS National, Inc., was voluntarily dismissed in open court at the hearing on plaintiff's motion.

Michael Russ, Bradley Slutsky, King & Spalding, Atlanta, GA and John Rawls, Suzanne Wilson, Blanc, Williams, Johnson & Kronstadt, Los Angeles, CA, for plaintiff.

Christopher Galanek, John Harbin, Powell, Goldstein, Frazier & Murphy, Atlanta, GA, and Samuel Littlepage, Dickinson, Wright, Moon, Van Dusen & Freeman, Washington, DC, for defendant.

*MEMORANDUM OPINION and ORDER*

RICHARD C. FREEMAN, Senior District Judge.

This action is before the court on the following motions: (1) plaintiff's motion for a preliminary injunction [# 7–1]; Defendant Stewart R. Friedman's motion to dismiss [# 13–1]; Defendant Custom Tees' motion to transfer [# 11–1]; and defendants' motion to file a supplemental affidavit [# 20–1]. All motions except the motion to file a supplemental affidavit are opposed. After receiving the briefs of the parties, after conducting a hearing on this matter, and after reviewing the unofficial transcript in this case.[2]

*GENERAL BACKGROUND*

Plaintiff is a comedian known throughout the country for his "redneck" humor. He is probably best known for his "you might be a redneck if ..." jokes. Examples of these jokes are:

—You might be a redneck if ... you've ever financed a tattoo.

—You might be a redneck if ... your two-year-old has more teeth than you do.

—You might be a redneck if ... your dog and your wallet are both on a chain.

—You might be a redneck if ... your dad walks you to school because you're in the same grade.

Plaintiff claims ownership to hundreds of jokes such as these, as well as a trademark and service mark.[3] His comedy album entitled "You Might be a Redneck If ..." has sold more than 1 million copies, more than any other comedy album in more than a decade. Plaintiff has also issued a calendar with 365 "you might be a redneck if ..."

jokes, one for every day of the year. In addition to these products, he sells t-shirts with his redneck jokes on them at his concerts and elsewhere.

In December, 1994, plaintiff, through some associates, became aware that t-shirts bearing exact replications of plaintiff's jokes were being sold in various stores across the country, including stores in Georgia. The only difference between plaintiff's jokes and those appearing on the t-shirts was the format. On one shirt, for example, the copy read "If you've ever financed a tattoo ... you might be a redneck."

An investigation by plaintiff's associates ensued, and the source of the t-shirts was determined to be defendant Custom Tees. Plaintiff's representatives contacted defendant Stewart R. Friedman, an employee of Custom Tees who admits to directing the marketing of, and assisting in the production of, Custom Tees' products, *see, e.g.,* Reply Brief in Support of Motion to Dismiss for Lack of Jurisdiction, at 7. Upon notification that the jokes violated plaintiff's copyright and/or trademarks, Friedman turned the matter over to his legal counsel.[4] Subsequent to these events, Custom Tees changed the copy on its t-shirts to read, to use a different example, "[W]hen you learn to drive in a car where you were conceived ... you ain't nothin' but a redneck." Plaintiff's Exhibit 24.

*Venue/Jurisdictional Issues*

**A. The court might have jurisdiction if**

**...**

▇ Custom Tees has already submitted to the jurisdiction of the court.[5] Friedman

---

**2.** Because neither party has, to date, ordered a transcript in this case, the transcript used by the court will be designated an "unofficial transcript." With the assistance of the court reporter, the court can confirm that all matters cited herein did in fact occur at the hearing, and that all quotes used in this Order are accurate. However, because this is an unofficial transcript, the specific page citations may change slightly when and if an official transcript is produced.

**3.** When used in connection with plaintiff's entertainment services, the "you might be a redneck" phrase functions as a service mark. For ease of discussion, and because the battleground in this action concerns goods as opposed to services, the

court will discuss the phrase only in terms of "trademarks." The legal analysis, of course, is not affected by this designation.

**4.** There is evidence that Friedman initially offered to pay a licensing fee for the shirts. Friedman, however, states in an affidavit that this offer was conditioned upon proof that plaintiff owned a copyright or trademark in the jokes. Whatever the case, the fact is that Friedman's legal counsel intervened and no licensing fee was paid or arranged.

**5.** It should be noted, however, that Custom Tees asserts that jurisdictional challenges were only

contests personal jurisdiction over him. Friedman claims that there is no jurisdiction over him because all of his acts related to this case were undertaken in his capacity as an employee of Custom Tees. He has only been in Georgia a couple of times, and then was only passing through.[6] He also points out that Georgia law requires jurisdiction to be established over him separately in his *personal* capacity, and that jurisdiction cannot be established just because he works for Custom Tees. *Girard v. Weiss*, 160 Ga.App. 295, 287 S.E.2d 301 (1981). For the reasons set forth below, however, the court finds that Friedman's argument is only partially correct, and further finds that the acts forming the basis for jurisdiction over Custom Tees also form the basis for jurisdiction over Friedman.

■ Under Georgia law, jurisdiction may be asserted over any non-resident who "commits a tortious injury in this state caused by an act or omission outside this state if the tort-feasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed ... in this state." O.C.G.A. § 9–10–91(3). "Both Georgia courts and federal courts applying Georgia law have construed [this section] to confer jurisdiction to the maximum extent allowable under due process." *Vermeulen v. Renault U.S.A.; Inc.*, 975 F.2d 746, 753 (11th Cir. 1992), *superseded on other grounds*, 985 F.2d 1534 (11th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 2334, 124 L.Ed.2d 246 (1993). The Due Process Clause is satisfied if the court finds that a non-resident has sufficient minimum contacts with the forum state, and that the exercise of jurisdiction would not offend " ' "traditional notions of fair play and substantial justice." ' " *Vermeulen*, 975 F.2d at 754 (quoting *International Shoe Co. v. Wash-*

*ington*, 326 U.S. 310, 315, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)).

There are two kinds of jurisdiction: general and specific. This case involves an assertion of specific jurisdiction. "A forum may exercise specific jurisdiction over a nonresident defendant if the defendant has 'purposefully directed' his activities to forum residents and the resulting litigation derives from alleged injuries that ' "arise out of or relate to" ' those activities." *Cable/Home Communication Corp. v. Network Productions, Inc.*, 902 F.2d 829, 857 (11th Cir.1990) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984))).

■ The court finds the following facts significant: Custom Tees admits, through a Friedman affidavit, that it shipped t-shirts to Georgia. See Affidavit of Stewart R. Friedman, ¶ 11, Exhibit A to Motion to Transfer. Further, the record contains an affidavit from Leon Lehrer, who identifies himself as an "independent sales representative" who telemarkets products of Custom Tees, Inc., including the redneck shirts at issue. Lehrer testifies in his supplemental affidavit[7] that he contacted Ms. Cynthia Robinson, a Senior Merchandiser for J.C. Penney in Carrollton, Georgia, on two occasions. Supplemental Affidavit of Leon Lehrer, ¶ 2.[8] Ms. Robinson testified at the hearing that she placed an order for Custom Tees' shirts after talking with Mr. Lehrer. These activities bring Custom Tees within the jurisdictional reach of this court.

Friedman testified via affidavit on his own behalf that he never "personally" marketed

---

*waived*, and that jurisdiction may not attach otherwise. Nonetheless, as the court demonstrates below, jurisdiction would attach to Custom Tees whether waived or not.

6. Because Friedman did not appear at the hearing, the court must rely upon his statements in affidavits.

7. Either the original affidavit is lost, was never filed, or the title of Lehrer's affidavit is a mistake, because the court cannot find the Lehrer affidavit anywhere in the record.

8. Lehrer further testified that Georgia is part of his "territory." *Id.*

or made contact with anyone in Georgia with respect to the Custom Tees shirts. Supplemental Affidavit of Stewart R. Friedman [Friedman Supp.], ¶ 12. He also testified in a previous affidavit that he never "individually" participated in the sale, marketing, etc., of redneck shirts. Affidavit of Stewart R. Friedman, Exhibit A to Motion to Dismiss, ¶ 7. Finally, he states that he has never "in his individual capacity, entered into any contracts with any individual or entity residing or located in the State of Georgia." *Id.*, ¶ 10.

■ As previously noted, however, Friedman admits that he directed the marketing and production operations of Custom Tees. This fact is significant when the nature of the claim against Friedman is considered. While it is true that the court's jurisdiction over Friedman ought to be considered separately, the law is well settled that a director, officer, or employee of a corporation can be held *jointly and severally liable* with the corporation if that person has direct involvement in the infringing activities of the corporation. *E.g., Realsongs v. Gulf Broadcasting Corp.,* 824 F.Supp. 89, 91 (M.D.La.1993). Friedman's position as a corporate employee does not shield him from liability, and it does not shield him from the jurisdiction of the court. *Delong Equipment Co. v. Washington Mills Abrasive Co.,* 840 F.2d 843, 852 (11th Cir. 1988), *cert. denied,* 494 U.S. 1081, 110 S.Ct. 1813, 108 L.Ed.2d 943 (1990) ("The crucial matter is whether the individual defendant can be held personally liable for acts committed in the forum, not whether his contacts with the forum arose in his personal capacity.").[9] Specific jurisdiction is inextricably conceptually intertwined with notions of liability: only the person who commits a wrongful act can be held liable, and only the person who commits a wrongful act in the forum can

be held liable in the forum. The necessary ingredient for each concept is the wrongful act. Where a corporation commits a wrongful act, and the law holds the individual equally and inseparably liable for the corporate act, then the basis for the exercise of jurisdiction is the same. For this reason, Friedman's consistent protestations that he never "individually" or "personally" had any contact with Georgia are irrelevant. Friedman is correct, however, that some contact with Georgia by Friedman is required, although he mistakes the nature of the contact. The question is whether Friedman *on behalf of* Custom Tees had any contact with Georgia.

Friedman's argument is partly correct because even though the individual/official capacity distinction does always not operate as a jurisdictional shield, something more than mere liability must exist before the long arm of the state can still reach the individual. "[I]f the claim against the corporate agent rests on nothing more than that he is an officer or employee of the nonresident corporation and if any connection he had with the commission of the tort occurred without the forum state," *Delong,* 840 F.2d at 852 (quoting *Columbia Briargate Co. v. First National Bank,* 713 F.2d 1052, 1064–65 (4th Cir. 1983)), then jurisdiction does not attach and the "shield" was not needed in the first place. What is needed is a purposeful act with or in Georgia. *Shellenberger v. Tanner,* 138 Ga. App. 399, 227 S.E.2d 266, 273–74 (1976). "Transacting business" is a purposeful act, and one need not be physically present to transact business. *Id.*

The court finds that, on this record, plaintiff has met his burden of showing that Friedman "transacted business" in this state

Defendants argue that *Delong* should be limited to the facts in that case, and that the decision in *Delong* is applicable only where the individual had been physically present in the forum. The court does not find *Delong* so limited. Indeed, the *Delong* court expressly held that "[i]f substantive liability can extend to an individual for acts performed on behalf of a corporation, then the individual is amenable to the forum's long-arm statute, *at least* in situations where the nonresident individual physically was present in the forum when he participated in the tort." *Id.,*

840 F.2d at 852 (emphasis added). Rather than limiting the scope of its rule, the court expressly recognized other scenarios within the ambit of the holding, even cases where the contacts are not as strong. Further, the Eleventh Circuit has also held that physical presence is not required to confer jurisdiction. *Cable/Home Communication,* 902 F.2d at 858. Therefore, the court cannot accept defendants' argument to distinguish *Delong.* (As noted in the text, however, *Delong* does not stand for the broad proposition that jurisdiction is coextensive with liability. *See infra,* p. 1206.)

on behalf of Custom Tees, that plaintiff has a cause of action relating to these acts, and that the exercise of jurisdiction over Friedman would be reasonable. *See id.,* 227 S.E.2d at 273 (citing rule). Friedman testified that he is an employee "with important responsibilities" in the daily operations of Custom Tees, that Custom Tees has only two employees (Friedman and his wife, whose duties are primarily financial), and that the business operates out of his Connecticut condominium. Friedman Supp., ¶¶ 6, 11, 15. It takes no great leap to conclude that, if anything is done on behalf of Custom Tees, it is done or caused to be done by Friedman. Friedman testified that Custom Tees received orders from stores in Georgia. Friedman Supp., ¶¶ 7–9. He does not state who at Custom Tees received the orders, but a fair inference is that it was Friedman on behalf of Custom Tees. Testimony at the hearing supports this inference. Richard Gudzan, the Foxworthy t-shirt licensee based in Georgia, testified at the hearing that he, upon learning that Custom Tees shirts existed, found out where the shirts came from, obtained the toll-free number of Custom Tees, called there, and left a message for someone to contact him regarding an order of t-shirts. Gudzan testified that Friedman called him back the next business day, and said "Rich, this is Stew. I understand you'd like to order some shirts." Unofficial Transcript, at 155–56. Even though Gudzan informed Friedman of the nature of the call, and even though the call was initiated by Gudzan, Friedman's response indicates, at a minimum, that Friedman could and would take orders for shirts and could and would establish a business relationship with someone in Georgia.

■ In short, the record leaves the court with the firm impression that Custom Tees' contacts with this state were established by Friedman. Custom Tees transact-ed business in this state, and the strong evidence is that Friedman directed those transactions. The court is not faced with a situation where a person is sued because of his title alone. *Cf. Delong, supra* (citing Fourth Circuit case law). Nor is this a case where jurisdiction is asserted over a corporate agent with minimal participation in the acts of the corporation. Rather, even though there is little hard evidence as to the actual contacts between Friedman and Georgia residents, there is nothing in the affidavits of Friedman to contradict the strong inference that any contacts of Custom Tees were established by Friedman.[10] Defendant Friedman's motion to dismiss is therefore denied.

### B. This Action's Venue Might be Proper If . . .

■ 28 U.S.C. § 1400(a) governs copyright actions. That code section provides that venue lies in any district where the defendant may be found. It is well settled that, based upon this language, venue in copyright actions is coextensive with jurisdiction. *Payne v. Kristofferson,* 631 F.Supp. 39, 44 (N.D.Ga.1985). In other words, where there is jurisdiction, there is venue. Because the court has already found that both defendants are amenable to the jurisdiction of this court, the court also finds that venue is proper.

### C. This Forum Might be Convenient If . . .

■ Determining whether this court is such an inconvenient forum so as to require a transfer in the "interests of justice" is another matter altogether. 28 U.S.C. § 1404(a). Plaintiff is from Georgia, but is currently a California resident. Friedman and Custom Tees are Connecticut residents. Friedman (and Custom Tees) argue that the United States District Court for the District of Con-

---

10. The Eleventh Circuit has held that, where an evidentiary hearing as to personal jurisdiction is not held, the court need only look to whether plaintiff presented a *prima facie* case of jurisdiction. *Cable/Home,* 902 F.2d at 855. The court is to accept plaintiff's allegations as true, to the extent that they are uncontroverted by the defendant's affidavits. *Id.* Where the evidence conflicts, the court is to construe all reasonable inferences from the evidence in favor of plaintiff. *Id.* In the instant case, although evidence was adduced bearing upon jurisdictional matters, the court did not conduct a hearing on jurisdiction because Friedman was not present. In any event, the court has determined that Friedman's affidavits do not substantially, if at all, controvert plaintiff's evidence, and even if such is the case, all inferences point to jurisdiction.

necticut is a more convenient forum than this court for several reasons. First, evidence and potential witnesses are located within 100 miles of the Hartford, Connecticut, area. *See* Supplemental Affidavit of Stewart R. Friedman, Exhibit A to Reply by Defendants [in support of Motion to Transfer], ¶¶ 11, 13–14. Second, Friedman testifies that the day-to-day operations of Custom Tees would be disturbed if he was forced to "participate in prolonged litigation" in a forum 1,000 miles away. *Id.*, ¶ 16. Third, his wife, who is the president of Custom Tees and whose duties are primarily related to the financial aspect of the business, would experience hardship if she were forced to take a "prolonged leave of absence" from her other employment in order to participate in this litigation. *Id.* Fourth, the Friedmans provide "meals and companionship" for Mrs. Friedman's 90 year-old father every evening, and Mr. Friedman asserts that the impact of the couple's prolonged absence on his father-in-law's health is difficult to predict. *Id.* Finally, defendants argue in their briefs that plaintiff has the resources to carry his fight anywhere, and that he has no special reason to bring suit in Georgia.

Plaintiff argues, however, that much of the evidence and many of the witnesses are located in Georgia. The evidence adduced at the hearing supports that contention, at least insofar as four Georgia residents testified. Further, plaintiff argues that his choice of forum is entitled to deference.[11] Though defendants correctly point out that this traditional deference is mitigated where the plaintiff is not a resident of the state, *e.g., Haworth, Inc. v. Herman Miller, Inc.,* 821 F.Supp. 1476, 1479 (N.D.Ga.1992), it is also true that some deference is still to be afforded. *Id.* (citing general rule). *Cf. Van Dusen v. Barrack,* 376 U.S. 612, 633, 84 S.Ct. 805, 818, 11 L.Ed.2d 945 (1964) ("There is nothing . . . in the language or policy of § 1404(a) to justify its use by defendants to defeat the advantages accruing to plaintiffs

who have chosen a forum which, although it was inconvenient, was a proper venue.").

Every forum, to a certain extent, will be inconvenient for at least one of the parties. The question is not inconvenience, but whether defendants have met their burden of showing that another forum is more convenient so that a transfer is required *in the interest of justice.* 28 U.S.C. § 1404(a). Section 1404(a) does not provide for a transfer to a "forum likely to prove equally convenient or inconvenient." *Van Dusen,* 376 U.S. at 645, 84 S.Ct. at 824.

The court declines to transfer the case. First, plaintiff may not be a current Georgia resident, but his ties here are undeniable. Second, there is a comparable number of potential witnesses and a comparable amount of evidence located in Georgia as there is in Connecticut. Third, Friedman's concern for protracted litigation will not be eliminated by transfer to Connecticut, because the nature and extent of the litigation will not change with the transfer. The real issue is whether Friedman will be required to travel to Georgia for extended periods of time. With the exception of the trial, if there is one, the court believes Friedman will travel no more often to and from Georgia, for deposition testimony,[12] etc., if the case is headquartered in Connecticut than in Georgia. Fourth, the expense and time to be expended in trial or in discovery will not change with the forum.

Finally, and perhaps most important, the purposes of a preliminary injunction would be, or would have been, frustrated by delaying consideration of plaintiff's motion until the jurisdictional and venue questions were determined. For this reason, the court considered all issues concurrently. While it is true that an injunction cannot bind those not within the jurisdiction of the court, and while it is true that an injunction ought not issue from a court where venue is improper, where the only concern is one of convenience, the interests of justice surely would be disserved by forcing a plaintiff to await ruling on a motion for preliminary injunction until a

---

11. The court takes no offense at the possible inference, accurate or not, that Georgia might be a more advantageous forum because there are more rednecks here than in Connecticut.

12. The court would certainly be amenable to requests to have depositions taken where the witnesses, as opposed to where the attorneys, are located.

more convenient court has time to receive, apprehend and consider the motion. In short, one significant factor that ought to be placed onto the § 1404(a) scales is the pendency of substantive motions requiring immediate attention. In view of the foregoing, the court finds that the convenience of the parties and witnesses will not be better served (and, if so, only slightly so), and the interests of justice would likely be disserved, by transfer of this case to a sister court in Connecticut. Defendant Custom Tees' motion for a transfer is denied.

## PRELIMINARY INJUNCTION

### A. Plaintiff Might be Entitled to a Preliminary Injunction If ...

To be entitled to a preliminary injunctive relief, a plaintiff must show:

> (1) a substantial likelihood that he will ultimately prevail on the merits; (2) that he will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest.

*Zardui–Quintana v. Richard,* 768 F.2d 1213, 1216 (11th Cir.1985) (Cit. omitted). The court will examine these factors *seriatim.*

### B. Plaintiff Might be Likely to Succeed on the Merits If ...

Plaintiff's request for injunctive relief is directed at the two components of his "redneck" jokes—the "you might be a redneck" phrase and the text of the jokes that follow. As to the phrase "you might be a redneck," plaintiff claims a common-law trademark. As to the joke portion, *e.g.,* "you've ever cut your grass and found a car," plaintiff claims a copyright.

13. In his reply brief, plaintiff asserts that his Lanham Act claim rests not only on the infringement of his common law trademark, but also on the use of the "you might be a redneck" phrase in combination with his other copyrighted material. Whatever the merits of this argument, because the court determines below that an injunction should issue preventing defendants from using any more of plaintiff's copyrighted material,

### 1) .... He Can Show a Violation of the Lanham Act

■■■ Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), protects unregistered, common-law trademarks from infringement by unauthorized users where the unauthorized use would likely confuse the consuming public as to the source or sponsorship of goods or services. *See Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.,* 510 F.2d 1004, 1010 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975). In order to prove a violation of Section 43(a), a plaintiff must prove "(1) that [he] has trademark rights in the mark or name at issue ...; and (2) that the defendant adopted a mark or name that was the same, or confusingly similar, to the plaintiff's mark, such that there was a likelihood of confusion for consumers as to the proper origin of the goods created by the defendant's use of the [mark] in [its] trade or business." *Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1512 (11th Cir.1984).

### (a) Does plaintiff have a trademark to protect?

The court must first determine, therefore, whether plaintiff has any trademark to protect. Plaintiff's asserted trademark lies in the use of the "you might be a redneck" device.[13] Defendants agree that a slogan or combination of words can serve a trademark function, but argue that the "you might be a redneck" device does not function as a trademark. Rather, defendants argue that the phrase is purely functional—*i.e.,* that the phrase is a feature "'essential to the use or purpose of the article.'" *Warner Bros., Inc. v. Gay Toys, Inc.,* 724 F.2d 327, 331 (2d Cir.1983) (quoting *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 850–51 n. 10, 102 S.Ct. 2182, 2186–87 n. 10, 72 L.Ed.2d 606 (1982)). Though the Eleventh

his second argument is irrelevant for the purposes of the injunction. The more important issue is whether the "you might be a redneck" phrase, or anything confusingly similar thereto, can be used in conjunction with material *not* owned by plaintiff. This issue bears directly upon the common-law trademark properties of the "you might be a redneck" phrase, and is the subject of the discussion in the text.

Circuit has not addressed the issue, the weight of authority holds that purely functional features cannot be the subject of trademark protection. *E.g., Standard Terry Mills, Inc. v. Shen Manufacturing Company, Inc.*, 803 F.2d 778, 780–81 (3d Cir.1986), *disapproved in part on other grounds*, 40 F.3d 1431 (3d Cir.1994).

■ Marks and features function as trademarks when they identify the source of particular goods or services. Purely functional features, however, are ornamental to the good or product itself, and therefore do not operate as a trademark. *Supreme Assembly, Order of Rainbow for Girls v. J.H. Ray Jewelry Company*, 676 F.2d 1079, 1083 n. 5 (5th Cir.1982). The question, then, is whether the phrase "you might be a redneck" is an identifying phrase, simply an integral part of the thing sold, or a combination of both. *See International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 919 (9th Cir.1980), *cert. denied*, 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981) (a feature of an item may "serve simultaneously as a functional component of a product and a trademark"); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204 (2d Cir.1979) (same).

■ First, the court finds that the phrase "you might be a redneck" does serve as a trademark when used in connection with plaintiff's humor. The evidence before the court indicates that, once plaintiff hit upon the right combination of words, that phrase became his "hook" or "catch phrase" by which he became known. Unofficial Trans., at 7–8, 9. Indeed, there was testimony from one of plaintiff's fans, Michael Steed, that plaintiff is in fact known in the public by that phrase. *Id.*, at 110–11. Further, the evidence before the court indicates that plaintiff's career began its rapid ascent only after he began using the phrase in conjunction with his jokes. *Id.*, at 6–7, 19, 21–22, 82–83. That alone, however, does not establish a trademark; it merely lays the foundation for the association of the public of the phrase "you might be a redneck" with plaintiff. In this regard, therefore, it is highly significant that plaintiff has created a number of marketable goods based upon the "you might be a redneck" phrase. Plaintiff's first book was entitled "You Might be a Redneck." Plaintiff's Exhibit 2. The name of his national comedy tour was the "You Might be a Redneck" tour. Unofficial Trans., at 38. The tour was promoted in advertising media (radio and print) using this title. *Id.*, at 39. The name of his platinum selling album is "You Might be a Redneck." Plaintiff's Exhibit 6. The name of his first comedy special on the Showtime network was "You Might be a Redneck If." Unofficial Trans., at 22–23. The same title was used on the videocassette version of his Showtime special. Plaintiff's Exhibit 3. Plaintiff has a "page-a-day" calendar with 365 different you might be a redneck jokes. Plaintiff's Exhibit 12. Plaintiff has three books on the market filled with "you might be a redneck" jokes. These facts, taken together, lead the court to the conclusion that a substantial segment of the viewing, listening, reading, and laughing public associate the phrase "you might be a redneck" with Jeff Foxworthy.[14]

■ Defendants argued at the hearing that the popularity of the above items is attributable to plaintiff, and not to the phrase "you might be a redneck," and that, even if the phrase plays a part, it only plays a functional part. The court disagrees in part.

---

14. The court notes that, under Section 43(a), a mark must acquire secondary meaning—"the power of a name or other configuration to symbolize a particular business, product, or company"—before it is entitled to protection only if the mark is "descriptive." *See University of Georgia Athletic Ass'n v. Laite*, 756 F.2d 1535, 1540 (11th Cir.1985) (citation omitted). A "descriptive" mark "tells something about the product." *Id.* A "suggestive" mark, by contrast, "subtly connotes something about the service or product," *id.*, and does not require a showing of secondary meaning. "Arbitrary or fanciful" marks are just that, and also do not require secondary meaning. *Id.*

Defendants assert that plaintiff's mark is descriptive if it is a trademark at all. Plaintiff, of course, contends that the mark is arbitrary or fanciful. As noted in the text below, the court finds that plaintiff's phrase falls between these two categories, and is suggestive. *See infra*, pp. 1207–1208. In any event, the court finds that plaintiff has presented strong evidence of secondary meaning, and therefore an entitlement to protection even if the phrase is merely descriptive.

The plain fact is that plaintiff has become known by this phrase. That he is known by his jokes as well does nothing to limit the fact that he is also known by the phrase. In this respect, the court find *Carson v. Here's Johnny Portable Toilets, Inc.*, 498 F.Supp. 71 (E.D.Mich.1980), *vacated in part on other grounds*, 698 F.2d 831 (6th Cir.1983), significant. In that case, the district court—as well as the Sixth Circuit on appeal—found that the phrase "Here's Johnny," the familiar introduction of the late night talk show host Johnny Carson, had become associated in the public's mind with Johnny Carson the entertainer. *Id.*, 498 F.Supp. at 74; *see also Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 832–33 (6th Cir.1983) (agreeing with district court on this issue). Carson's efforts to market the phrase were not as extensive as Mr. Foxworthy's. *See* 498 F.Supp. at 73 (discussing authorized uses of "Here's Johnny" and the Carson persona). If plaintiff had not used the phrase as identifying indicia on so many of his products, or if the phrase had been varied, the court might agree with defendants on this issue. But plaintiff has not, and the court does not.

The court does agree, however, that the phrase is "functional" to a certain extent. The joke "You might be a redneck if . . . you consider a six pack of beer and a bug zapper quality entertainment" clearly depends upon the "you might be a redneck" phrase for its delivery. Notwithstanding this facial functionality, however, the court finds the functionality defense insufficient to foreclose protection of plaintiff's phrase. First, it is questionable whether the "functionality" of the phrase fits into the legal description of functionality. In *Warner Bros., supra*, a case cited by defendants, the Second Circuit also stated that "[a] design feature of a particular article is 'essential' only if the feature is dictated by the functions to be performed; *a feature that merely accommodates a useful function is not enough.*" *Id.*, 724 F.2d at 331 (emphasis added). The telling of a redneck joke does not *require* an introductory (or conclusory) phrase. Indeed, there are other southern comedians who have their own style of redneck humor and who tell redneck jokes in a different form. Using an introductory phrase simply accommodates the style of plaintiff's humor.

More important, even if the "you might be a redneck" phrase does fall within the functionality category, this does not foreclose all protection for the phrase. In this respect, *Dallas Cowboys Cheerleaders, supra*, is instructive. In that case, the Second Circuit held that the uniforms worn by the famous cheerleading troupe were entitled to trademark protection, notwithstanding the fact that the uniforms served an obviously functional purpose. 604 F.2d at 203. The court stated:

> Plaintiff does not claim a trademark in all clothing designed and fitted to allow free movement while performing cheerleading routines, but claims a trademark in the particular combination of colors and collocation of decorations that distinguish plaintiff's uniform from those of other squads. . . . [T]he fact that an item serves or performs a function does not mean that it may not at the same time be capable of indicating sponsorship or origin[.]

*Id.*, 604 F.2d at 203–04. Similarly, in the instant case, plaintiff does not claim a trademark in all redneck humor. Rather, plaintiff claims a trademark in the phrase that distinguishes his particular brand of redneck humor from the other comedians performing similar material. Therefore, as in *Dallas Cowboys Cheerleaders*, the mere fact that the phrase "functions" to deliver a joke does not deprive the phrase of protection where the phrase also "functions" to distinguish plaintiff's brand of humor. For the foregoing reasons, the court finds that plaintiff's phrase "you might be a redneck" is entitled to protection from confusingly similar phrases used in similar contexts.[15]

---

15. Because the litigants at issue compete in the same area, *i.e.*, humorous t-shirts, the court need not address whether the use of the phrase "you might be a redneck" in contexts dissimilar from humor and comedy would violate plaintiff's trademark. The court does note, however, that in *Carson, supra*, both the district court and the Sixth Circuit found that the "Here's Johnny" phrase, when used in connection with portable toilets, would not confuse the public as to origin or sponsorship of the portable toilets. The court believes the same concept would likely apply to

### (b) Are defendants likely to cause confusion?

The Eleventh Circuit (and its predecessor, the former Fifth Circuit) has long held that the *sine qua non* of Section 43(a) actions is a showing that consumers are likely to be confused "with respect to such things as the product's source, its endorsement by plaintiff, or its connection with the plaintiff." *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 389 (5th Cir. 1977). *See also id.* at 389–90 ("Our cases demonstrate an unbroken insistence upon likelihood of confusion. . . ."). The question, therefore, is whether defendants' "When . . . You Ain't Nothin' But a Redneck" phrase is likely to confuse the public as to whether plaintiff is the source of the t-shirt.

■ In determining likelihood of confusion, the Eleventh Circuit has held that a court must consider the following factors:

1). The strength of the plaintiff's mark;

2). the similarity between the plaintiff's mark and the allegedly infringing mark;

3). the similarity between the products and services offered by the plaintiff and defendant[s];

4). the similarity of the sales methods (*i.e.*, retail outlets or customers);

5). the similarity of the advertising methods;

6). defendant[s]' intent, *e.g.*, do[ ] the defendants hope to gain a competitive advantage by associating [their] product with the plaintiff's established mark; and

7). the most persuasive factor on likely confusion[,] . . . actual confusion.

*Conagra*, 743 F.2d at 1514. The court will address each factor in turn.

#### i). *The strength of plaintiff's mark*

■ Although the court has already found that plaintiff's phrase "you might be a redneck," when used in connection with plaintiff's humor, whether in book, video, novelty item, or other form, has attained secondary meaning, the court finds that plaintiff need not make such a showing be-

cause plaintiff's phrase is "suggestive" within the legal meaning of that term. As previously noted, a "suggestive" mark "subtly connotes something about the service or product." *University of Georgia Athletic Ass'n*, 756 F.2d at 1540. The Eleventh Circuit has explained that "[a] suggestive term suggests the characteristics of the service 'and requires an effort of the imagination by the consumer in order to be understood as descriptive' of the service." *Investacorp, Inc. v. Arabian Inv. Banking Corp.*, 931 F.2d 1519, 1523 (11th Cir.), *cert. denied*, 502 U.S. 1005, 112 S.Ct. 639, 116 L.Ed.2d 657 (1991), (quoting in part *American Television & Communications Corp. v. American Communications & Television, Inc.*, 810 F.2d 1546, 1549 (11th Cir.1987)).

Suggestive marks are inherently distinctive, and are to be afforded strong protection. *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833, 840 (11th Cir.1983) ("[T]he more distinctive plaintiff's mark, the stronger it is considered, and the more protection it is accorded from confusingly similar marks."). Of the four categories of marks (*i.e.*, generic, descriptive, suggestive, and arbitrary or fanciful), suggestive marks are second only to arbitrary marks in distinctiveness. *Investacorp*, 931 F.2d at 1522.

With these principles in mind, the court finds the phrase "you might be a redneck" suggestive of plaintiff's humor. For example, when customers see "you might be a redneck" as the title for a comedy album, the customers must use their imaginations (or buy the album) to discern the content of the humor, because the phrase itself simply suggests the subject matter of the humor. It is true, of course, that in the context of the t-shirts submitted to the court for review, there is no imagination required. That, however, is a practical and unavoidable result of the juxtaposition of the phrase with the humor it suggests. Suppose, however, that the phrase "you might be a redneck if" appeared only on the front of a t-shirt, with the text of the joke appearing only on the back. Someone familiar with plaintiff's humor would like-

the "you might be a redneck" phrase if such phrase were used in a non-humorous context, if

such a case is possible.

ly recognize the shirt by the phrase (because the phrase operates as a trademark), but the person would have to turn the shirt over to get the joke. More important, someone not familiar with plaintiff's humor would not know from the phrase on the front what would follow on the back. This characteristic of the phrase demonstrates its suggestive nature. The court, therefore, finds that this first factor favors plaintiff.

### ii). The similarity between the plaintiff's mark and the allegedly infringing mark

In order to assess this factor, the court must assess the "overall impression" created by the two marks. *See Jellibeans,* 716 F.2d at 842; *Armstrong Cork Co. v. World Carpets, Inc.,* 597 F.2d 496, 502 (5th Cir.1979). The phrases "you might be a redneck" and "you ain't nothin' but a redneck" therefore are not to be simply parsed into separate words, nor are they to be viewed in a vacuum.

The court finds that the two phrases convey a similar overall impression. First, as plaintiff points out, although the words in the middle differ, the phrases both begin and end the same way: "you ... a redneck." Defendants argue that the words in the middle *do* make a difference, because not only are the "visual and phonetic differences ... substantial," but "the meaning or connotation created by the phrases is clearly quite different (defendants' phrase message being a positive statement, whereas plaintiff's phrase is 'conditional' and raises a mental inquiry)." Defendants' Brief in Opposition to Plaintiff's Motion for Preliminary Injunction, at 31. To the contrary, the *message* is the same even though the delivery is not. Both phrases provide a "test" to the reader for whether one is a redneck. Plaintiff's idea in creating his phrase was to create "a way for people to tell." Unofficial Trans., at 7. Plaintiff chose "might" after rejecting other choices such as "you could be a redneck" or "you know you're a redneck." *Id.,* at 8. Whether plaintiff used "might" as opposed to "know" does not change the effect. Using "ain't nothin'

but" conveys a similar impression. Again, the issue is the result, not the precise language.

In addition to the language used, the context of the phrases is also similar—indeed, in the shirts shown to the court, identical. When the phrases are used in connection with an example of redneck life, whether contributed by plaintiff or not, the impression conveyed is the same. Divorced from the joke, the phrases may not be terribly similar. The words cannot be divorced from the humor, however, and the court finds that this factor favors plaintiff.

### iii). The similarity between the products and services offered by the plaintiff and defendant[s]

This factor obviously supports plaintiff. The litigants are competitors in the humorous t-shirt business.

### iv). The similarity of the sales methods

The undisputed testimony at the hearing indicated that both parties sell, or want to sell, their t-shirts to department stores and other retail markets. In fact, there was testimony at the hearing that plaintiff had difficulty marketing his t-shirts to J.C. Penney, a well-known department store chain, *because of* the presence of defendants' shirts. This factor therefore also supports plaintiff.

### v). The similarity of the advertising methods

Though there was little testimony at the hearing concerning this factor, the court finds it significant that Cynthia Robinson, a senior merchandiser at J.C. Penney, testified that someone from the t-shirt company (she thought his name was "Leon") "called and made the reference to I'm sure you're aware by now about the redneck tees, and you know Jeff Foxworthy, he's so funny, blah, blah, blah, and he was just telling me about some of the phrases and quoted a few of the jokes that's on the t-shirts." Unofficial Trans., at 128.[16]

---

16. Plaintiff also refers the court to Exhibit C to the supplemental declaration of Suzanne Wilson,

counsel to plaintiff, which is a copy of a facsimile sent by defendant Friedman to a J.C. Penney

The court notes that the record contains an affidavit from Leon Lehrer, who identifies himself as an "independent sales representative" who telemarkets products of Custom Tees, Inc., including the redneck shirts at issue. Lehrer testifies in his supplemental affidavit that he did, in fact, contact Ms. Robinson, Supplemental Affidavit of Leon Lehrer, ¶ 2, but carefully stated that "no one during the period when I was soliciting sales for Custom Tees Redneck shirts ever mentioned Jeff Foxworthy's name or asked if Custom Tees was in any way affiliated with Jeff Foxworthy." *Id.,* ¶ 3. Lehrer further states, "I never represented to any individual I called ... that the shirts were in any way related, endorsed, or otherwise affiliated with Jeff Foxworthy." *Id.,* ¶ 4. This affidavit does *not* contradict the testimony of Ms. Robinson, because Lehrer does not state that *he* never mentioned Jeff Foxworthy. His statement that "no one mentioned ... or asked if," when read in conjunction with the next paragraph stating what *he himself* never did, leaves the court with the clear impression that Lehrer states only that *he* was never asked and *he* never told about Foxworthy's sponsorship of the shirts. These statements may indicate that no one ever mentioned the name *to him,* but he does not state that he never uttered Jeff Foxworthy's name to Ms. Robinson. Given the credible and apparently unbiased demeanor of Ms. Robinson at the hearing, her testimony itself, and Lehrer's "walking-on eggshells" affidavit, the court believes Ms. Robinson's testimony is entitled to substantial weight. In view of this finding, the court concludes that this factor also favors plaintiff.

### vi). Defendant[s]' intent

■■■■ Even though a finding of fraudulent intent and bad faith is not necessary, *Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609, 613 (7th Cir.1965), the court finds that this factor weighs heavily in favor of plaintiff. At the hearing, the court received in evidence 11 t-shirts sold by defendants bearing the exact same "operative" language used by plaintiff. To explain the content of the language, defendant Friedman submitted conflicting affidavits. In support of defendant Custom Tees' motion to transfer, Friedman testified that the redneck material in the Custom Tees shirts came from "brainstorming" sessions with other people or from informal suggestions from other people. Affidavit of Stewart R. Friedman, Exhibit A to Motion to Transfer, ¶ 22. In support of his brief in opposition to plaintiff's motion for a preliminary injunction, Friedman testified that he received several jokes from his son-in-law, who suggested that they be put on t-shirts. Affidavit of Stewart R. Friedman, Exhibit A to Brief in Opposition to Plaintiff's Motion for a Preliminary Injunction, ¶ 10. Friedman testified in the same affidavit that, at the time, he had never heard of plaintiff. *Id.,* ¶ 11.

While the court recognizes that the two affidavits do not *necessarily* conflict, the fact that the text of the shirts is nearly identical and the testimony at the hearing from Ms. Robinson lend support to the court's strong suspicion that the content and form of defendants' t-shirts was not accidental. Even if such is not the case, there is little evidence in the record to support a finding of *good faith.* Defendants at the very least knew they were not using their own material.

### vii). Actual confusion

■■■■ As a preliminary matter, the court notes that evidence of actual confusion is not required, although it is especially important when it does exist. *See Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 263 (5th Cir.), *cert. denied,* 449 U.S. 899, 101

---

buyer, Jeannine Penkilo. The fax contained promotional materials of Custom Tees in addition to promotional materials for plaintiff's authorized products. Plaintiff argues that this shows not only defendants' bad faith, but that defendants seek to poach upon plaintiff's advertising efforts, as well. The court disagrees. Friedman submitted a supplemental affidavit, which the court accepts, that describes the circumstances of the fax to Penkilo. Specifically, Friedman states that the fax was sent upon request of Penkilo, and served a purpose unrelated to the solicitation for more merchandise. Supplemental Affidavit of Stewart R. Friedman (dated February 10, 1995), ¶¶ 2, 4–7. Ms. Penkilo also submitted an affidavit confirming the truth of Friedman's statement. Affidavit of Jeannine Penkilo, passim. Accordingly, the court rejects the significance plaintiff attributes to the fax.

S.Ct. 268, 66 L.Ed.2d 129 (1980). In this regard, at the hearing in this case, there was testimony from Michael Steed, an individual not affiliated with this case in any formal sense.[17] Mr. Steed testified that, a few weeks after having seen plaintiff in concert in late November, Mr. Steed and his wife were at a dinner party with friends when the subject of plaintiff and his humor arose. Unofficial Trans., at 105. One of his dinner companions told Mr. Steed that a local J.C. Penney had some of plaintiff's shirts on sale. *Id.* A few days later, Mr. Steed went to the J.C. Penney to purchase some of the shirts for his children. *Id.,* at 106. Mr. Steed testified that he entered J.C. Penney and encountered what he later discovered to be defendants' t-shirts.[18] *Id.* Although he testified that he was almost certain the shirts were not plaintiff's, Mr. Steed recognized the jokes and the phrases on them as plaintiff's jokes and phrases. *Id.,* at 107.

Three things are significant about this testimony. First, according to Mr. Steed, upon hearing about plaintiff's humor at the dinner party, one of the people at the table told Mr. Steed that J.C. Penney had plaintiff's shirts on sale. Though Mr. Steed may not have been confused, this testimony is evidence that *someone* was confused.[19]

Second, Mr. Steed, in some respects, is not an ordinary consumer. Not only is he very well acquainted with plaintiff's humor, but he has also been to at least five concerts where he saw plaintiff's official t-shirts for sale. Mr. Steed identified the differences in the t-shirts as the reason for his belief that defendants' shirts were not authorized. *Id.,* at 107–08. Again, as to this point, *Dallas Cowboys Cheerleaders* is instructive. In that case, the defendants argued (much as the defendants here might argue) that no one would possibly believe (just as Mr. Steed did

not believe) that the Dallas Cowboy Cheerleaders sponsored the infringing product, the X-rated movie "Debbie Does Dallas." [20] The Second Circuit held that the likelihood of confusion analysis is not to be so narrowly construed. Rather, the court held that the film would cause an association in the minds of the viewers with the cheerleaders, and that "[t]his association results in confusion ..." *Id.,* 604 F.2d at 204.

Similarly, in the present case, Mr. Steed immediately *associated* the jokes with plaintiff, and was fairly convinced that the shirts were not "the real McCoy" for other reasons. Thus, in one respect, the mere fact that Mr. Steed's suspicions were aroused because of the association indicates confusion on a legally cognizable level. *Cf. Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,* 523 F.2d 1331, 1342 (2d Cir.1975) (even though customers may know the difference between the products, the public may subliminally associate the names, thereby causing confusion).

More important, defendants' t-shirts, though distinguishable in appearance from plaintiff's shirts, utilized the association to gain a competitive advantage. *See id.* (even though actual purchasers know the difference, "[s]uch *initial* confusion works an injury to Steinway") (emphasis added); *Brach Van Houten Holding, Inc. v. Save Brach's Coalition,* 856 F.Supp. 472, 475 (N.D.Ill.1994) ("[C]onfusion should be measured based on an initial understanding, rather than an understanding that may develop after careful reading of the material."). *See also Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 259 (2d Cir.1987) (likelihood of confusion found where infringer "would gain crucial credibility during the initial phases of a deal"). This "getting-the-foot-in-the-door"

---

**17.** Mr. Steed knows Jay Foxworthy, plaintiff's brother; has briefly met plaintiff before; and has attended several of plaintiff's concerts.

**18.** Mr. Steed testified that, at the time, he did not know who made the shirts. Unofficial Trans., at 112.

**19.** Defendants at various points in this lawsuit have argued that some of the evidence presented by plaintiff cannot be considered because it is hearsay. Whether that is the case depends upon

the individual statements challenged. As to the statement of the dinner companion to Mr. Steed, it clearly is not hearsay because it is not offered for its truth. Rather, the statement was offered to show both Mr. Steed's state of mind and to explain his subsequent trip to J.C. Penney.

**20.** The facts of that case are set forth in the Second Circuit's opinion, and are better left there.

aspect is significant to the likelihood of confusion analysis because the relevant concern is not confusion through a side-by-side comparison, but whether confusion is likely when only one product, such as the one with the foot in the door, is the only product on the shelf. *See Elizabeth Taylor Cosmetics Co. v. Annick Goutal, S.A.R.L.*, 673 F.Supp. 1238, 1248 (S.D.N.Y.1987); *E & J Gallo Winery v. Consorzio del Gallo Nero*, 782 F.Supp. 457, 466 (N.D.Cal.1991). When a customer such as Mr. Steed views defendants' t-shirts alone, he or she does not have the ability to compare the shirt with plaintiff's, and, as a result, would have to search his or her memory—if any thought is given to the subject at all—to discern the source of the shirts. Mr. Steed is probably atypical, and was able not only to perform this mental function, but also to process the information in an accurate fashion. That, however, is irrelevant. The important thing is that, whether the consumer discerns the truth or gives it no thought whatsoever, the fact that some mental process *must* be performed in order to understand the association indicates not only an unfair competitive advantage but the actual embodiment of confusion.

Finally, Mr. Steed's testimony as to his "lack" of confusion regarding the products implicates another issue: point-of-sale versus post-sale confusion. The Eleventh Circuit has held that the likelihood of confusion analysis does not depend upon confusion of the purchaser at the time of purchase. Rather, the question is whether the *public*, not the purchaser alone, would be confused by the use of the mark. *See United States v. Torkington*, 812 F.2d 1347, 1352–53 (11th Cir. 1987).[21] As a general matter, it is again worth noting that Mr. Steed's "inverse-confusion" came about because he was an informed customer. It takes no great leap to conclude that less-informed potential purchasers would be confused at the point of sale. It is also significant, however, that the placement of the defendants' t-shirts on the market, and in the public after sale, would cause the public viewing the t-shirts to associate the shirts with plaintiff, regardless of whether the purchaser himself or herself was confused. *See id.; Ferrari S.p.A. Esercizio Fabriche Automobili E Corse v. Roberts*, 944 F.2d 1235, 1244–45 (6th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 3028, 120 L.Ed.2d 899 (1992); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871, 872–73 (2d Cir.1986); *Rolex Watch U.S.A., Inc. v. Canner*, 645 F.Supp. 484, 488, 493–95 (S.D.Fla.1986). Simply stated, the fact that Mr. Steed was not "actually" confused at the point of sale does not change the likelihood that others would associate defendants' shirts with plaintiff, whether at the point of sale or in the public after sale.

Evidence of actual confusion is often hard to acquire. *See, e.g., Lois Sportswear*, 799 F.2d at 874. As the Second Circuit has recognized, it is "particularly difficult to make any showing of actual confusion" where, as here, "the plaintiff move[s] for injunctive relief before the allegedly infringing trademark ha[s] been widely disseminated." *Lobo Enterprises, Inc. v. Tunnel, Inc.*, 822 F.2d 331, 333 (2d Cir.1987). The Eleventh Circuit has also noted that, where the products are relatively inexpensive and constitute impulse purchases, evidence of actual confusion can be elusive. *See AmBrit, Inc. v. Kraft, Inc.*, 805 F.2d 974, 987–88 (11th Cir.), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1986); *see also E & J Gallo*, 782 F.Supp. at 464–65 (confusion more likely where products are impulse purchases, such as wine). The *AmBrit* court also stated that "it takes little evidence to establish the existence of the actual confusion factor. Moreover, that there were only a few reported instances of actual confusion does not mean that only those individuals were actually confused." *Id.*, 805 F.2d at 987.

These principles apply to the instant case and imbue Mr. Steed's testimony with great significance. There was uncontroverted evidence at the hearing that t-shirts are inexpensive items of apparel, and that they are considered an "impulse" purchase. *E.g.*, Unofficial Trans., at 111. Further, plaintiff moved for injunctive relief almost as soon as

**21.** *Torkington* was a Trademark Counterfeiting Act case. The Eleventh Circuit, however, held that the likelihood of confusion analysis under that statute mirrors that under the Lanham Act. *See Torkington*, 812 F.2d at 1351, 1352.

defendants' activities were discovered. Finally, despite these obstacles, plaintiff managed to produce at least one instance of actual confusion. On this record, and under the totality of the circumstances, *see AmBrit*, 805 F.2d at 987, the court finds that this factor also favors plaintiff.

### (c) Summary of Lanham Act Analysis

 The court finds that plaintiff has demonstrated a likelihood of success on the merits of his Lanham Act claim. First, the court finds that plaintiff has used the phrase "you might be a redneck" as a trademark, and that a substantial portion of the public associates this phrase with plaintiff and his humor. More important, the court finds that each factor in the likelihood of confusion analysis favors plaintiff, some more strongly than others. On the other hand, none of the factors favors defendants. As a result, the court is left with the firm conclusion that defendants' t-shirts would cause confusion in the public as to their source and sponsorship.

### 2) . . . . He Can Show Infringement of His Copyright

 In order to prove copyright infringement, plaintiff must show that he is the owner of a valid copyright and that the works copyrighted were copied by defendants. *Howard v. Sterchi*, 974 F.2d 1272, 1275 (11th Cir.1992). To prove unlawful copying, plaintiff must show that defendants had access to his copyrighted work and the defendants' work is substantially similar to plaintiff's. *Id.*

With regard to the jokes at issue, defendants do not argue that the text of their t-shirts exactly duplicated jokes found in plaintiff's books. Their defense to the copyright claim instead concerns plaintiff's purported ownership of the jokes at issue. Specifically, defendants argue that the copyright registration for one of plaintiff's books is a "compilation" registration, and that the registration does not cover the individual material compiled.[22] Defendants also argue that the jokes themselves are not original to plaintiff, and that he therefore cannot claim "authorship" in them. The court finds defendants' arguments without merit.

 Defendants cite *Feist Publications v. Rural Telephone Service Co.*, 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) for the proposition that compilation copyrights cover the selection, arrangement, and coordination of the pre-existing material compiled. This, of course, is true. *Id.*, 499 U.S. at 359, 111 S.Ct. at 1295. What *Feist* does not say, however, is that the copyright in a compilation extends *only* to the selection and arrangement of materials. Rather, copyright extends to the "author's original contributions." *Id.*

Understanding the nature of the *Feist* decision is essential to understanding this distinction. Defendants state that the instant case presents only a slight variation on the facts of *Feist*. Nothing could be further from the truth. *Feist* was founded upon two canons of copyright law: copyright requires originality, and facts are never original. *Id.* Because the compilation at issue in *Feist* was a *fact* compilation (names, addresses and telephone numbers), there could not be any copyright protection for the preexisting materials—*i.e.*, the facts. Rather, copyright protection extends "only to those *components of a work* that are original to the author." *Id.*, 499 U.S. at 347, 111 S.Ct. at 1289 (emphasis added). *See also Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 547, 105 S.Ct. 2218, 2224, 85 L.Ed.2d 588 (1985) ("[C]opyright does not prevent subsequent users from copying from a prior author's work those constituent elements that are not original ... as long as such use does not appropriate the author's original contributions.").

---

**22.** Defendants do not argue that plaintiff does not have "standing" to sue on the copyright because the form of the registration, for a compilation, is insufficient. Rather, the argument is directed to the copyrightability of the constituent elements of the compilation, the jokes. *See Feist Publications v. Rural Telephone Service Co.*, 499

U.S. 340, 361, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991) (even though the vast majority of the materials compiled in telephone directory were not copyrightable, the directory's publisher still had a valid copyright because *some* of the compilation was original).

This does not mean that preexisting materials cannot be the subject of copyright protection. As the Court noted, "copyright ... has no effect one way or the other on the *copyright* or public domain status of the preexisting material." *Id.* (quoting Congress' legislative report accompanying the Copyright Act of 1976) (emphasis added). Indeed, the statute itself does not rule out the copyrightability of the preexisting materials. *See* 17 U.S.C. § 103(b) ("The copyright in a compilation ... extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and *does not imply* any exclusive right in the preexisting material.").

These principles combine to illustrate the point defendants seek to finesse: the preexisting materials may be subject to copyright protection under the umbrella of a compilation copyright. Although defendants are correct that they did not copy the "constituent elements" of the *compilation* (the selection and arrangement of the jokes), whether they copied the original contributions of the author in the preexisting material (the jokes themselves) is another question altogether.

■ Defendants argue that the jokes are not original to plaintiff because he receives ideas, often in the form of jokes, from others. To support this assertion, defendants point to the Foreward to plaintiff's book, *Red Ain't Dead,* where plaintiff wrote

[N]ot a day goes by that someone doesn't offer me a new example of 'redneckism' ... With the help of my wife and friends, I add several to the list almost daily. I have collected numerous Redneck Lines from radio audiences and even from my live show audiences.

Plaintiff's Exhibit 4, Foreward. Defendants therefore argue that "plaintiff's work consists of preexisting 'public domain'—[sic] material that was 'authored' by many persons over the years." Defendants' Brief in Opposition to Plaintiff's Motion for Preliminary Injunction, at 11.

Plaintiff testified at the hearing in this matter that he does in fact receive ideas from other sources, but more than 95% of his redneck joke ideas are original to him. Unofficial Trans., at 79. More important, plaintiff testified that, even when he receives an idea from another person, it is plaintiff who takes the idea and gives it the expression in the form it appears in his books. *Id.,* at 11–12, 52, 53, 57–58, 59, 72, 78–79. In other words, plaintiff testified unequivocally that he wrote every word in his books, calendars, etc. Finally, plaintiff testified that he wrote and had the ideas for each joke appearing on defendants' t-shirts produced at the hearing. *Id.,* at 79.

■ Defendants' argument mistakes the nature of authorship and originality. In *Feist,* the Court stated that "[t]he most fundamental axiom of copyright law is that '[n]o author may copyright his ideas or the facts he narrates.'" *Feist,* 499 U.S. at 344, 111 S.Ct. at 1287 (quoting *Harper & Row, supra*). Facts are not copyrightable because they lack the "*sine qua non*" of copyright—originality. *Feist,* 499 U.S. at 344, 111 S.Ct. at 1287. Narrated ideas are not copyrightable because they are not fixed in tangible form. Where, however, an idea is written or otherwise fixed in tangible form, a copyright is earned if the expression is original.

The *Feist* Court noted that "[original], as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Id.* The Court went on to note that the level of creativity required is extremely low, and the "vast majority" of works will possess some kind of "creative spark." *Id.*[23]

It must be stressed that, because ideas are not the stuff of copyrights, copyrights inhere in the expression used. Two painters painting the same scene each own a copyright in their paintings. Two news organizations covering the same event each own a copyright in

---

**23.** *Feist* was an unusual case because it involved the "creativity" of the selection and arrangement of uncopyrightable facts. This case is not nearly as unusual. Indeed, defendants do not challenge

the creativity of plaintiff's jokes, but whether he was the originator of them. As explained below, defendants mistake the nature of originality.

the stories written by their reporters. As the *Feist* Court put it, "[o]thers may copy the underlying facts from the publication, but not the precise words used to present them." *Id.*, 499 U.S. at 348, 111 S.Ct. at 1289.

In the same way, two entertainers can tell the same joke, but neither entertainer can use the other's combination of words. This is where defendants' argument misses the mark. Copyright is concerned with the originality of the expression, not the subject matter. Plaintiff repeatedly stated that he uses other people's ideas, but he puts them in his own words. At the hearing, he explained why:

> A joke is [ . . . ] a strange thing. And probably to the public, they never realize this. But I have—with a comic, we all have the same bowl of words to work with, and the whole trick is to take the smallest amount of words and put them in the proper order. You know, I've sat backstage with Jay Leno or Gary Shandling and sometimes for ten or fifteen minutes argued about a particular one line in a joke, which word should go where, should you delete this, which word should go to the end of the joke, and so that's why it changes. I mean, it's to get the maximum laugh from, you know, the shortest amount of material.
>
> Q. How important is the particular expression of the joke versus the underlying idea of the joke?
>
> . . . .
>
> A. Well, I mean the idea is key in coming up with the wording. You need—the idea comes first and then you play with it to get the wording correct.

Unofficial Trans., at 18–19. Plaintiff clearly established at the hearing that all of the jokes copied by the defendants were not only his own ideas, but his own expression. His expression clearly evidenced a "modicum of intellectual labor," *Feist*, 499 U.S. at 346, 111 S.Ct. at 1288 (quotation marks and citation omitted), and defendants clearly copied that expression verbatim. Accordingly, plaintiff has shown a likelihood of success on the merits of his copyright claim.

**C. Plaintiff Might Suffer Irreparable Injury If . . .**

As plaintiff correctly notes, copyright and trademark actions are common venues for the issuance of preliminary injunctions. *E.g., Original Appalachian Artworks v. Topps Chewing Gum*, 642 F.Supp. 1031, 1040 (N.D.Ga.1986). When a plaintiff makes a *prima facie* showing of either trademark or copyright infringement, irreparable harm is ordinarily presumed. *Id.* Defendants' primary argument on this score is that they changed their phrase "you ain't nothin' but a redneck" before the litigation began, and that an injunction is therefore unnecessary. They also argue that plaintiff has not made a *prima facie* showing. Those two arguments, however, have been foreclosed by the foregoing discussion. Therefore, irreparable harm is still to be presumed, and this factor favors plaintiff.

**D. The Balance of Hardships Might Favor Plaintiff If . . .**

Gudzan testified at the hearing that sales to J.C. Penney of official Foxworthy shirts are being held up until this litigation is resolved. Defendants' shirts in J.C. Penney have been placed under a "code two," which means discontinued. Failure to issue the injunction would harm plaintiff by, at a minimum, forcing him to compete with an infringer, at least in places other than J.C. Penney. Issuing the injunction, however, will harm defendants only to the extent that they cannot sell illegally infringing t-shirts. This factor favors plaintiff.

**E. The Public's Interest Might be Served If . . .**

The public's interest is served any time the law is upheld and enforced. In the copyright context, enforcing the exclusive rights of authors promotes the "progress of science and the useful arts," U.S. Const. art. I, § 8, a constitutional recognition of the value of art and science to the citizens of this country. The impetus for protecting the trademark of a person or entity from infringement by others is the desire to prevent confusion in the marketplace among the consumers. In both contexts, therefore, enjoining illegal infring-

ing activity serves the public interest. This factor, like all others, favors plaintiff.

## CONCLUSION

Accordingly, plaintiff's motion for a preliminary injunction [# 7–1] is GRANTED. Defendant Stewart R. Friedman's motion to dismiss [# 13–1] is DENIED. Defendant Custom Tees' motion to transfer [# 11–1] is DENIED. Defendants' motion to file a supplemental affidavit [# 20–1] is GRANTED. An Order granting and setting the terms of the injunction has been issued separately.

SO ORDERED.